Order accordingly.

BRINCKERHOFF and others *against* BROWN and others (*a.*)

Where a cause is brought to a hearing, on the bill and answer, the answer is to be taken as true, in all points.

A company incorporated under the act, sess. 34. ch. 67. is not considered dissolved, (so as to render the stockholders, individually, responsible to the extent of their shares, for the debts of the corporation,) by reason of a sale of its visible property under execution for its debts, and a temporary suspension of its manufacturing business, as long as by a regular election of trustees, there has been a continued succession, and the company kept in operation, and has the capacity to increase the subscription, or call in more of its capital, and to reassume its business.

THE bill, filed *February* 19th, 1821, stated, that on the 19th of *September*, 1815, six of the defendants, named, associated for the purpose of manufacturing cotton goods, and, in pursuance of the act of the 22d of *March*, 1811, (sess. 34, ch. 67.) filed a certificate in the office of the Secretary of State, on the 2d of *October*, 1815, declaring that they had formed themselves into a company, in pursuance of the act, under the name of " *The Genesee Manufacturing Company.*" That the amount of the capital stock should be 40,000 dollars, to be divided into shares of 100 dollars each; the number of trustees to be five; and the five defendants, first named, were named trustees for the first year. The operations of the company were to be

(*a*) This cause was decided *May* 14th, but, by mistake, has been inserted out of its order.

1823.

BRINCKER-
HOFF
v.
BROWN.

carried on in the town of *Gates*, in the county of *Genesee*. That the trustees prepared an agreement, to be signed by the stockholders, stating their shares; that the sum of five dollars was to be paid on each share, at the time of sub-scription; and that they would pay such instalments as should be required, from time to time, by the directors. That all the shares were subscribed for. That the trustees have never collected from the subscribers any part of their subscriptions, except in a few instances; and not, in any case, exceeding the amount of the first instalment. That the company purchased of the defendant, *Thomas Mumford*, land in the village of *Frankfort*, for the payment of which the defendant, *Brown*, in behalf of the company, by authority from the trustees, of the 1st of *October*, 1816, gave a bond and mortgage to secure the purchase money, being 2032 dollars and 11 cents. On this land the company erected a valuable factory, with valuable machinery. That the defendant, *Smith*, constructed the machinery; and the company, by order of the trustees, gave him notes for various sums, payable at different periods. That in *October*, 1817, *Smith* applied to the plaintiffs, *B. & B.* and *D. & H.*, to purchase goods on a credit, and offered, as collateral security, two notes of the company, signed by *Brown*, by order of the company, and indorsed by *Smith*, each for the sum of 3944 dollars, dated *January* 1st, 1817; the one payable in one year, and the other in two years, with interest. That *Smith* stated, that he was one of the trustees, and well acquainted with the affairs of the company, which he represented to be in a prosperous con-dition; and the plaintiffs, confiding in his representations, &c., sold him goods, &c., and took his notes, and the two notes of the company, as collateral security. That when the notes became due, payment was demanded, which was refused; and the plaintiffs, *B. & B.*, sued the company on their two notes, and recovered judgments on the 9th of *No-vember*, 1818, and the 21st of *May*, 1819. That it was the

duty of the trustees to have collected from the stockholders a sufficient amount of instalments to have paid those notes, &c. That the defendants, *J. W.* and *R. S.*, being trustees, with intent to possess themselves, for a very inadequate consideration, of the real and personal estate of the company, and to defraud the creditors, in violation of their duty as trustees, on the 23d of *March,* 1818, fraudulently caused a judgment to be entered up on a warrant of attorney, against the company, in favour of *B. H.*, &c.; and, with the same fraudulent intent, caused an execution to be issued thereon, &c., and the machinery, &c. of the factory to be sold, on a few days notice, for 555 dollars, and purchased by the defendants, *B. & W.* That the machinery, at the time of sale, was worth 15,000 dollars, which was its cost, and the other personal property was worth 3000 dollars, &c. &c. The bill further stated, that the five trustees fraudulently caused another judgment to be entered up against the company, and an execution to be issued thereon, by virtue of which the real estate of the company was sold, on the 19th of *February,* 1821, to the *Browns,* for 6455 dollars and 74 cents, which was far less than its real value.

That by these sales the company became dissolved, and by force of the statute, the trustees and the other stockholders became liable not only for the amount uncalled for and unpaid on the shares of stock, but individually, for the debts of the company. That the defendant *Mumford,* proceeded to foreclose the mortgage; and, to prevent a forced sale, the plaintiffs purchased the mortgage on the 4th of *January,* 1819, for 375 dollars, being the balance due on it, and it was assigned to two of the plaintiffs, who hold in trust for all of them. The bill charged, that the defendants refused to satisfy the claims of the plaintiffs against the company, or to collect in the debts due to the company, or to sell the property of the company to the best advantage, or to require the stockholders to pay their

subscriptions, or to discover the names of the stockholders, and the balance due from each, or to relinquish the purchase of the machinery, and other personal property, or to permit the plaintiffs to redeem and sell the same, or to desist from proceeding on the judgment in favour of the *Browns,* or to relinquish the purchase of the real estate made under the execution. That the defendants, by the certificate of their association, misrepresented the real amount of their capital, in order to deceive and give a false credit. That the trustees ought to be deemed, as regards the creditors, holders of the shares not *bona fide* subscribed. *Prayer,* that the defendants be decreed to cause the stockholders to fill up their stock, and *bona fide* to sell the property of the company, and apply the proceeds to pay the plaintiffs; and that they pay the deficiency, if any, as individual stockholders, at the time of the dissolution of the company, and for general relief.

The answer of the six first named defendants, (filed *August* 31, 1822,) admitted the certificate of incorporation, &c.; that 330 shares were subscribed by the persons named in schedule A., annexed to the answer; that some of the stockholders sold out, and others purchased in; and schedule B. contained a list of the present stockholders, and the sums paid and due on their shares, as they stood on the 19th of *February,* 1821, when the bill was filed, since which there had been no alteration; that schedule C. contained a list of the shares forfeited for non-payment of the instalments called for, and of the sums paid before the forfeiture. The defendants further stated the names of the trustees at the different periods, from the first incorporation to *October* 1, 1821, two of whom were necessary parties, but omitted by the plaintiffs; they stated the different instalments called for, from time to time, to the 26th of *September,* 1821, and the amount paid, &c.; that 83,000 dollars was originally subscribed in good faith, and was deemed an adequate

1823.

BRINCKER-
HOFF
v.
BROWN.

capital; that the embarrassment of the company was not owing to a want of funds, but to the general decline of the manufacturing business, in and since the year 1818; that the trustees have applied 22,076 dollars and 44 cents, being 298 dollars and 93 cents more than they have received, in the payment of debts, expenses, and repairs; that they have been compelled to suspend the operations of the company since 1819, by reason of the suits brought against them by the plaintiffs and *A. Williams.* They admitted the purchase of *Mumford,* the mortgage to him, and the assignment of it to the plaintiffs for the balance, as stated in the bill. They admitted the notes given to *R. Smith,* for constructing the machinery, &c.; they knew nothing of the application of *R. Smith* to the plaintiffs, or of his representatives; they did not believe that they wrote a letter to *B. Huntington,* representing the company as solvent, though they verily believed the company to be so in 1817; and that if the manufactures had not been depressed by the causes stated, they would have continued solvent. They admitted the judgments as charged in the bill; but they were ignorant of the executions, and of the returns made on them; that *R. S.* went to *New-York* to purchase cotton for the company, in *October,* 1817, and he was furnished with a guaranty, signed by four of the defendants, to the amount of 3000 dollars; that *S.* purchased the cotton of *B. H.,* and gave him the notes of the company, dated *October* 17, 1817; that the notes not being paid, and *B. H.* threatening to sue the persons who agreed to be sureties, the trustees, for his and their security, gave a bond and warranty of attorney to *B. H.,* on which a judgment was entered up. The defendants denied that this was done fraudulently, or with intent to possess themselves of the real and personal estate of the company for an inadequate price, or to defraud creditors, or in violation of their duty; but that the same was done honestly and with good faith; that in

*April,* 1818, execution was issued on the judgment, and the personal property of the company, consisting of machinery, &c., was duly and regularly advertised for sale, and the defendants consented to the sale, solely to raise money to pay the judgment, and to indemnify those who had subscribed the guaranty to *B. H.,* and with no other view. That the sale was public and fair, and attended by a number of persons; and that the property was struck off for 555 dollars, was owing to the depression of manufacturing concerns, and the public opinion of the little value of that species of property. The defendants, *M. B.* and *J. W.* answered, that they purchased the machinery, verily believing that they had a right to purchase it for their own benefit, and did so purchase it, but always intending to return it to the company on being reimbursed their payment; and that being since informed, that the purchase would be considered in equity as made for the benefit of the company, they have abandoned all claim to it, and the same has since been sold, under an execution issued for the balance due *B.H.,* and the property is no longer in the possession or control of these defendants, and they have charged the amount of their bids to the company. The defendants further answered, relative to the judgments and executions against the company, and denied all fraud. They denied, that by the sales of the property, the company had been dissolved; and they averred that the company had been constantly in operation, the trustees regularly elected, and the business of the company transacted up to the time of filing the bill, though the business of the factory had been suspended, on account of the depreciation of cotton stuffs, &c. They denied that the trustees or other stockholders had become liable for the arrearages on the shares; and averred that they had always been ready to pay the plaintiff, as far as the funds of the company would permit; and that they had, at all times, used their best endeavours to collect the instalments from the stockholders, and the debts due, which they stated in the schedules annexed to the answer, &c.

*April 4th.* The cause was brought to a hearing on the bill and answers.

*J. Platt,* for the plaintiff.

*A. Spencer,* for the defendants.

THE CHANCELLOR. The cause has been brought to a hearing by the plaintiffs upon the bill and answer, and consequently, the answer is to be taken for true "in all points." This was one of Lord *Bacon's* rules, (rule 64.) and it was afterwards adopted by Lord *Clarendon ;* and it is a rule admitted throughout the books to be well settled. (*Grosvenor* v. *Cartwright,* 2 *Ch. Cas.* 21. *Bohun's Cur. Canc.* 149.) All the averments, in the answer, are to be taken for true ; and even where the defendant states, that he believes and hopes to be able to prove such and such matters, they must be considered as proved, as the plaintiff, by not replying, has excluded the defendant from the opportunity of proving his averments. (*Barker* v. *Wyld,* 1 *Vern.* 140.)

Every allegation of fraud and intentional abuse of trust, is fully and explicitly denied in the answer; and I am now to inquire whether the facts charged and admitted, are sufficient to warrant a decree in favour of the plaintiffs, notwithstanding there be no fraud in fact imputable to the defendants, and notwithstanding every averment in the answer of any matter of fact, is to be taken for true.

The plaintiffs contend, that the defendants, who subscribed the certificate, filed in the secretary's office, in 1815, in pursuance of the statute, and in order to constitute themselves a body politic and corporate, were guilty of fraud, in declaring, " that the amount of the capital stock of the Company should be 40,000 dollars," inasmuch as only 33,000 dollars were originally subscribed. The answer to this objection is very obvious and decisive. The statute could not have had reference to the whole capital then ac-

1823.

BRINKER
HOPE
v.
BROWN.

*Where a cause is brought to a hearing on bill and answer, the answer is to be considered true in all points :—and where the defendant states that he believes and hopes to be able to prove such and such matters, they are considered as proved.*

tually subscribed, for the subscriptions were of course to be made after the corporation was created. There could not be subscriptions to the stock of a corporation until the corporation was actually created, and if no more subscriptions could afterwards be procured than to the amount of 33,000 dollars, would that render the parties chargeable with fraud in law, (for fraud, in fact, is out of the question,) in filing the original certificate? Or, suppose it should be deemed advisable not to create a capital to the whole amount limited by the charter, and that a less sum would be adequate to the objects of the company, can it, for a moment, be supposed, that the trustees, or original associates, are liable, individually, for the deficiency? The act provides, that the trustees may call in the capital actually subscribed, to such extent only as they should deem proper. It rests entirely in their discretion, and to be governed by their sense of the exigencies of their business.

It is undoubtedly a far-fetched suggestion, that the plaintiffs were induced, in 1817, to give credit on the assumption of a capital originally subscribed, to 40,000 dollars, when it is not stated that the plaintiffs made any inquiries as to the fact, and when the credit of the company, in 1817, must have rested upon circumstances then existing. Their stability must have depended upon the manner in which their capital had been previously employed and dispersed, and upon the probable productiveness, at that time, of capital employed upon cotton fabrics.

It is further contended, that the stockholders were individually responsible, to the extent of their shares of stock, for the debts of the company, according to the provision of the statute, on the ground that the corporation was dissolved; and the corporation is said to have been dissolved by the sales on execution of their real and personal estate, and by the suspension of the business of the factory. The defendants admit the sales and the suspension of the business of the factory, arising from the depreciation of cot-

ton stuffs, and the numerous suits brought against them; but they deny that, in point of fact, the corporation is dissolved, and aver, that the company has been constantly in operation, and the trustees regularly elected and continued in succession, and the business of the company constantly transacted, down to the filing of the bill.    There was the regular annual election of trustees, in *October*, 1820, a few months before the filing of the bill; and again in *October*, 1821, eight months after the commencement of the suit; and in *September*, 1821, there were calls made upon the stockholders for payment of three different instalments upon their shares, by a resolution of the trustees. It does not follow that a corporation is dissolved by the sale of it visible and tangible property, for the payment of debts, and by the temporary suspension of its business, so long as it has the moral and legal capacity to increase its subscriptions, call in more capital, and re-assume its business.    There could be no room for doubt as to the actual existence of the corporation, if it were not for the decision of the Court of Errors, in the case of *Slee* v. *Bloom.* (19 *Johns. Rep.* 456.) On examination of the reasons delivered by the Chief Justice in the Court of Errors, it appears to me, that the doctrine upon which that case was decided, does not apply to this.    It was there admitted, that neither " mis-user nor non-user could be relied on as a substantial and specific ground of a dissolution." The ground upon which the corporation in that case was held to be dissolved, was, that the corporation had done, and suffered to be done, acts equivalent to a direct *surrender*.    It not only ceased to own any property, but the trustees had ceased to act from *December*, 1817, to the filing of the bill in *April*, 1819, and had done no act in that time " manifesting an intention to resume their corporate functions."

I do not think I am warranted in carrying that decision beyond the circumstances of the case, and to hold that

1823.

BRINCKER-
HOFF
v.
BROWN.

1823.
BRINCKER-
HOFF
v.
BROWN.

one of these circumstances, viz. the sale of their visible property, is, of itself, sufficient evidence of a surrender, when all the other material circumstances are wanting. What essentially distinguishes that case from this is, that there the trustees had virtually renounced their trust, and ceased to act, and the regular annual election of trustees was discontinued. That was, in fact, the best evidence the case afforded of a virtual surrender. But here, every such presumption is rebutted by the acts and declarations of the trustees. They continue their succession, they meet and pass resolutions, direct further instalments to be paid in, and deny, in their answer, that they have surrendered or renounced their corporate trust; and they aver, that the company has been constantly in operation. Though their real property had been sold on execution, yet no deed had been executed, and no title passed. The company had still a portion of the year remaining unexpired to redeem the land, when the bill was filed. Under all these circumstances, I think I should not be warranted by the doctrine of the case of *Slee* v. *Bloom*, and there is nothing, certainly, in the *English* law to warrant me, in holding the corporation in this case to have been dissolved by the surrender or abandonment of its corporate powers.

Here, then, a fatal objection at once presents itself to this bill. The corporation, in its corporate capacity, is not a party to a suit for a corporate debt; and the individual stockholders are not responsible, in their private capacity, as upon a dissolution of the company.

And, if we were not embarrassed by this technical objection, and the question was fairly before me, under competent parties, touching the abuse of trust by the several defendants, I could not hold that a single charge was supported upon the admissions and against the averments in the answer.

What is the language of the answer to the charges

in the bill? It is, that the subscriptions were received in good faith, and deemed by the trustees an adequate capital. The embarrasments of the company did not arise from the want of funds, but from the general decline of manufacturing business, and the loss of all profit in the manufacturing of cotton goods. The funds received have been faithfully expended in the payment of debts, and the current and unavoidable expenses of the establishment. The defendants do not believe they ever wrote a letter to *B. Huntington*, representing the company to be solvent, though they verily believed it to be so, in *October*, 1817 The notes which the company gave to *Smith*, and which he passed to the plaintiffs, were no doubt given for a valuable consideration, and were given upwards of nine months before *Smith* passed them away. It is impossible to deduce any inference of fraud against the defendants, from the negotiation of the notes. The judgment in favour of *B. Huntington*, was honestly and *bona fide* confessed, for a full and fair consideration; and the personal property of the company was duly, regularly, and fairly sold and purchased in by a part of the defendants, with no other view than to indemnify themselves for personal responsibilities assumed for debts contracted for the benefit and use of the company. The personal property, so sold, would not, at the time, have sold for a greater price in cash. It was purchased by part of the defendants, in full belief that they had a right to purchase it on their own account, and for the purpose mentioned. They always intended to surrender it up to the company upon being reimbursed, and they did afterwards relinquish all claim to it; and it has since been sold on execution for the balance of *Huntington's* judgment, and purchased by an agent of *Huntington*, and the defendants have not the custody or control of the property, and are willing it should be sold under any execution against the company, upon the reimbursement of the sums paid by them. The ac-

1823.

BRINCKER-
HOFF
v.
BROWN.

count of *Francis Brown & Co.* against the company, was correct and just, and the trustees who examined it, allowed it to be so, and authorized a *cognovit* to be given in the action commenced against the company by the *Browns.* The real estate of the company was sold on execution under that judgment, and purchased by those creditors for its full value. The whole transaction was conducted in good faith, and the defendants say, they have at all times used their best endeavours to collect the *calls* on the stockholders, and suits are now pending for the recovery of instalments. In short, the defendants, by their answer, repel every suggestion of fraud, and explain every transaction, and insist on an honest discharge of their trust to the best of their ability.

This is the substance of the answer; and assuming it to be true in all points, I cannot see any ground for the charges in the bill, or any title to relief, as against these individual defendants.

There is a balance due on the mortgage given by the company, and assigned to the plaintiffs; but the bill is not adapted for the foreclosure of that mortgage. The company are a necessary party, for they are the mortgagors. There does not appear, therefore, to be any sufficient ground for the bill, and, consequently, it must be dismissed. But considering the nature and difficulties of this case, and the circumstances which led the plaintiffs to institute the suit, I shall not charge them with the defendants' costs. The case has, indeed, been attended with peculiar interest, owing to the former unsuccessful efforts of the plaintiffs to repair their losses, in respect to this same demand. (4 *Johns. Ch. Rep.* 671. S. C.)

Bill dismissed, without costs.