STATE OF MISSOURI EX REL. ATTORNEY-GENERAL, Appellant, *v.* SOCIÉTÉ RÉPUBLICAINE DE SECOURS AUX EMIGRÉS FRANÇAIS VICTIMES DE LA GUERRE, Respondent.

### May 25, 1880.

1. Mere mistakes or acts of misuser or non-user are not enough to warrant a judgment of ouster against a benevolent corporation.

2. A legal surrender of the corporate franchise of a benevolent corporation will not be presumed from non-user, nor from failure to collect dues or to hold meetings for a short time.

3. Such a corporation cannot be dissolved on account of loss of members, where enough remain to supply vacancies and continue the succession.

APPEAL from the St. Louis Circuit Court, THAYER, J. *Affirmed.*

A. J. P. GARESCHÉ, for the appellant : Where the corporation does, or suffers to be done, that which has the effect to destroy the object for which it is created, this is equivalent to a surrender of its corporate franchise. — *Moore* v. *Whitcomb*, 48 Mo. 547 ; *State Savings Instn.* v. *Kellogg*, 52 Mo. 588. A single act of violation justifies a decree of forfeiture.—*New Haven* v. *Bank*, 31 Conn. 106. Illustrations. — *The Commonwealth* v. *Bank* ; 28 Pa. St. 389 ; *President* v. *The State*, 19 Md. 295 ; *The State* v. *Railroad*, 24 Texas, 130.

I. D. FOULON, for the respondent : Not every non-user is a ground for forfeiture. — 4 Gill & J. 107 ; 23 Wend. 236 ; *The Commonwealth* v. *Bank*, 28 Pa. St. 383 ; High on Extr. Rem., sects. 648, 667 ; *The State* v. *Turnpike Co.*, 2

Sneed, 255 ; *The State* v. *Trust Co.*, 8 Humph. 254 ; *Harris* v. *Railroad Co.*, 51 Miss. 606.

Bakewell, J., delivered the opinion of the court.

This is a proceeding in the nature of *quo warranto*, the object of which is to forfeit the corporate franchise of defendant for non-user. The date of the information is December 12, 1877. The date of the incorporation of defendant is June 22, 1874. It appears from the charter of defendant that the object of the organization is to create a fund to assist emigrants from the French departments devastated in the Prussian war, especially from the territory surrendered to the Prussians, and also to help persecuted republicans. All Frenchmen and friends of France who will consider themselves in honor bound to contribute to the society the minimum sum of fifty cents monthly shall be considered as members. The society shall determine at its monthly meetings the amount of funds it shall, expend for assistance during the following month, and shall not be dissolved so long as it numbers six members. In case the society shall be dissolved, its funds are to be distributed to the Société Française de Bienfaisance, of St. Louis. The society had thirty-seven members when incorporated. Of these, fifteen were then in arrears, and never paid up.

It does not appear how many meetings were held in 1874. About $60 was distributed that year. In 1875, it appears that meetings were held monthly, except in September and October. There was in the treasury $1,257 ; and about $60 was distributed for the objects of the society, and by vote, $500 to French sufferers from an inundation of the river Garonne. A meeting was held in December of that year. The minutes report ten members present. The monthly dues of all were in arrears for periods ranging from twelve to eighteen months. Besides these, three others claimed to be members, who were all

in arrears for like periods. At this meeting it was resolved that the payment of monthly dues be suspended for six months, and that all who had paid dues in 1875 be considered members in good standing. It was also resolved that relief be given to all French-speaking poor, as well as new arrivals, to the extent of not more than $10 to any family. The balance on hand was then $973.69. The next meeting was in June, 1877. Vice-president in chair; present also six members. The treasurer reported $330 distributed to French poor of the city as well as to new arrivals. The proportion does not appear. The balance on hand was $672. The president moved the dissolution of the society; the motion was not seconded. It was carried that the adjournment should be to December 15th, and that no relief should be granted meanwhile. Two members then resigned, and left the meeting without a quorum. On December 12, 1877, this proceeding was begun; and on December 26, 1877, seven persons, being all who claimed to be members, and all of whom were months in arrears, applied to a justice of St. Louis for a warrant to authorize one of their number to call a meeting to elect officers. The warrant was issued and the meeting called by advertisement, and officers elected, who accepted.

It was shown that punctual payment of dues had never been exacted, but the constant practice had been for members to make payments for three, four, and sometimes ten months at a time.

G. Pierrot, on behalf of the relator, testified: "I was for three or four years a member of the society. When these proceedings were instituted, it had but three or four members remaining. I know of no legal members at that time — that is, of any who were not in arrears for their dues. I had not then attended a meeting for nearly two years previously. I ceased to attend when I ceased to be a legal member — that is, got in arrears for my dues. The society was then very inactive. It had some $1,200 to

$1,500 in the treasury. I can't say what was the amount of their donations; only have a general idea. Sometimes members would get in arrears for a month or more, and later pay up all. I cannot now recall a single instance where relief was refused to persons entitled to it out of the funds of the society, but there were such instances."

F. Jacquemin, on behalf of the relator, testified: " I am no longer a member of the society, and ceased, so far as I was concerned, when it ceased to have a quorum, which was in October, 1876. I acknowledge nothing after the meeting of November, 1875, when I was present. At that meeting it was resolved to dissolve the society, and to distribute the funds in the treasury among the French poor. This proposition, offered by Mr. Bonnet, was adopted, and there was an adjournment to a future day to accomplish the purpose. Eleven members were present. At the adjourned meeting there were but seven members present, of whom two resigned to work the dissolution of the society. At the former meeting, at which the dissolution was first broached, there were, of those present, six or eight members who were in arrears for their membership dues. I was one of the two present at the adjourned meeting who resigned so as to reduce the number of actual members of the society to a number below seven. Until I resigned, I was always present at the meetings of the society, and, so far as I know, its minutes were correctly kept. At each meeting they would be read and approved. I assisted at the meeting of June, 1877. I was then president, and on my arrival, the vice-president offered to me the chair; but I told him not to leave it, as I desired to make a motion that the society be dissolved. There were but seven members of the society. It was not carried, and I then resigned as president, and I and another also resigned as members, reducing them to five. Since then I know nothing of its proceedings."

Philip Luckner, for the defence, testified : " Since August,

1870, I have been secretary of the defendant. There has been no dissolution of it by any vote of its members. I hold in my hand the record-book of its proceedings, and the minutes have been by me correctly kept and transcribed. Jacquemin was always a member until June 15, 1877, when he resigned. Since then there has been a meeting every six months, as required by the resolution of December 15, 1876.''

[The resolution referred to above declares that when adjournment took place it should be for six months.]

'' I can't say that there ever was a formal resolution passed that when members did not pay they should forfeit their membership. We have all along given relief, except during the six months when, by the resolution passed June 15, 1877, it was suspended. Since then we have been granting relief regularly to applicants from Alsace or Lorraine. We did so yesterday, and last week.''

On cross-examination, the witness said : —

'' I did not strike out those in arrears unless they notified me that they no longer wished to be members. Though the resolution of December 15, 1876, did not formally say that meetings should be held only every six months, so I interpreted it. When names of delinquents were dropped, it was done by me, without motion. All receipts and disbursements are mentioned in the proceedings.''

John P. Besançon, on behalf of the defendant, testified : '' I have been treasurer of the society since June, 1877, making disbursements to such persons as are mentioned in the charter, and then had $672, and at the last meeting in December, 1878, I had but $420 ; the rest, save for attorneys' fees, had been expended in sums of two or three dollars, the payments being made under the authority of the executive committee.''

The cause was tried by the court, a jury being waived. The finding and judgment were for defendant. The above statement contains the substance of all the testimony and

admissions ; and the only question presented by the record is, whether the court was, as a matter of law, bound to render judgment of ouster on the state of facts thus presented.

It does not appear — unless this is to be implied from the language of the charter cited above, as to determining at regular meetings the amount to be expended during the following month — when the meetings were to be held. It is not made a condition of membership that members shall contribute at stated periods any sum. It would seem to be sufficient for membership that one claims to be a member and a friend of France, and recognizes an honorable obligation of paying at the rate of at least fifty cents a month when called upon, and has not been formally expelled. These are the conditions prescribed by the charter, and no by-laws are shown. If the Garonne sufferers were not persecuted republicans or residents of provinces devastated during the Franco-Prussian war and contemplating emigration, there would seem to be an abuse in distributing funds of the society to them. Some money was also given to French poor in St. Louis, not *emigrés*, and not shown to have been persecuted republicans, though possibly they were so ; and counsel for appellant admits that these charitable contributions were made in good faith. This proceeding, however, is for non-user, and not for misuser. This evidence was introduced and admitted on the theory, perhaps, that it tended to show non-user.

In order that a forfeiture of the grant be adjudged, there should be a manifest violation of the charter clearly shown. This is the general rule ; and the courts proceed with great caution, and are slow to declare a forfeiture. Mere mistakes and errors, and acts of misuser and non-user that do not amount to wilful and repeated violations of the contract between the corporation and the State, are not held to be sufficient to warrant judgment of ouster in regard to business corporations ; and we do not see why the rule should

be more strict in regard to a benevolent society. Where non-user is the ground of forfeiture, it is said that it should be total and clear. And the burden of proof is on the relator who asserts that the facts warranting a forfeiture exist.

A legal surrender may be presumed where there has existed an entire non-user of corporate franchises, and a neglect to choose corporate officers for a great length of time. In Vermont it was held (*Brandon Iron Co.* v. *Gleason*, 24 Vt. 228) that a corporation would not lose its corporate existence by having ceased to do business from 1841 to 1852, and by disposing of its property, and neglecting to choose corporate officers for that time. In the often quoted case of *Slee* v. *Bloom*, 5 Johns. Ch. 366 and 19 Johns. 456, it was said that eighteen months would not have this effect; and so, in Massachusetts (*Russell* v. *McLellan*, 14 Pick. 63), and in Connecticut (7 Conn. 47), a non-user of ten years was held not to work a loss of corporate franchises.

Purely business and manufacturing corporations formed under general statutes, and which are a species of business partnerships, are deemed dissolved when they cease to do business and have become divested of their property; but these decisions are made in reference to the rights of creditors, the statute having conferred a general liability on the stockholders. In these cases the corporation has not only ceased to be, but is without means of resuscitation or of resuming business. *Barclay* v. *Talman*, 4 Edw. Ch. 123. And it was held (*Brinckerhoff* v. *Brown*, 7 Johns. Ch. 217) that where there is a capacity to reassume business, the loss of its property does not dissolve a corporation. Nor can a corporation be dissolved for loss of its members so long as enough remain to continue the succession and supply vacancies. *The State* v. *Trustees*, 5 Ind. 77.

An act of incorporation is a contract between the sovereign and the members of the corporation; and except so far as, by its charter or constitutional provisions, there is a

time of duration limited, it is by its nature perpetual; and though the contract may, by consent, be abrogated and discharged, and this consent be presumed from the acts of the corporation, and though there is a tacit condition in every grant that the corporation shall act up to the end of its institution, and the State may undoubtedly forfeit the charter as for a condition broken through abuse or neglect of its franchise on the part of the corporation, yet the law does not design that the charter of a corporation should be revoked for every imaginable breach.   The dissolution of charters under James II. was probably lawful and regular, but nothing was perhaps more hateful to the people than the facility with which this was done during the reign of that most unpopular king.

In the present case it does not appear that there has been any violation by non-user or by neglect of any express mandatory provision of the charter essential to the continued corporate existence of the society.   It cannot, we think, be fairly said that the testimony shows that this corporation had at any time less than six members, that its organization was abandoned with no design of keeping it up, or that its members were not using the franchise for the object for which it was given, though they certainly seem to have become cold at the work, and to have remained in a state of torpor until aroused by the vigorous proceedings set on foot in the name of the State.

The corporation, by the express terms of its charter, is not to be dissolved so long as it has six members.   We think that there is no evidence from which it must be inferred that the membership has ever fallen below that number, or that the purposes of the organization have been entirely abandoned by the members, or that they have not been in good faith and continuously, though sluggishly, pursued.   Even though the evidence should be held to show a misuser in appropriating funds to poor French people in St. Louis and to Garonne sufferers, — and this seems to be a fair, though

perhaps not a necessary inference from the testimony, — we doubt whether it shows such wilful and persistent misuser as would warrant a forfeiture for misuser, had misuser been charged in the information, which is not the case.

The judgment of the Circuit Court ought to be affirmed, unless that court erred in refusing to enter judgment of ouster upon the evidence. We cannot say that this was the case. The judgment will, therefore, be affirmed. Judge HAYDEN concurs ; Judge LEWIS is absent.