State *v.* Butler.

STATE, for use of Memphis, *v.* BUTLER.

(*Jackson.*    May 17th, 1888.)

1. CORPORATIONS.  *Existence and transfer of franchises.  Issuance of stock certificates.*

The rights, franchises, and exemptions granted to a corporation by its charter may exist, and be validly transferred, without issuance or transfer of stock certificates, where there is other satisfactory proof of subscription and payment of stock, and of organization of the corporation, and of a *bona fide* transfer, not merely of the paper charter, but of the stock, franchises, and exemptions of the corporation.

Case cited and approved: 105 U. S., 217.

2. SAME.  *Same.  Legislative recognition.*

Repeated recognitions of the existence of a corporation by legislative acts passed prior to Constitution of 1870, operate, perhaps, as a waiver of, and preclude inquiry into, defects and irregularities affecting its creation and organization.

*Aliter,* it would seem, since Constitution of 1870, Art. XI., Sec. 8.

Cases cited and approved: 4 Pet., 480; 70 N. Y., 338; 31 Barb., 258; 66 Mo., 228; 3 Tenn. Ch., 396.

3. SAME.  *Dissolution.  Insolvency and Assignment.*

A corporation is not dissolved, nor its franchises, etc., forfeited, by its insolvency and assignment of its assets for the benefit of its creditors, where the State brings no proceeding to have the charter forfeited, and there is no surrender thereof by act of the share-holders.

Cases cited and approved: 10 Gray, 245; 7 Johns. Ch., 217.

4. SAME.  *No power to absorb each other.  Purchase by share-holders.*

An *insurance company* cannot, either directly or indirectly, absorb a bank, so as to draw unto itself the rights, franchises, and exemptions contained in the bank charter; but there is no legal objection to the purchase of the stock, franchises, etc., of the bank by *share-holders* in the insurance company.  Of this latter character is the transaction in this case.

Case cited and approved: 31 N. J. Eq., 475.

5. SAME.  *Exemption from taxation.  Contract.  Constitutional Law.*

That an exemption from taxation granted to a corporation by act passed prior to Constitution of 1870, and then accepted and acted upon by

State *v.* Butler.

the corporators, is a contract binding upon the State, which cannot be impaired by subsequent legislative acts or constitutional provisions, is too well settled to be now open to debate.

Case cited and approved : *In re* Union & Planters' Bank, 13 Lea, 407.

(But see now Constitution, 1870, Art. XI., Sec. 8.)

6. SAME. *Same. Extent of exemption. Case in judgment.*

A bank charter providing that the bank "shall pay annually one-half of one per cent. on each share of its capital stock, which shall be in lieu of all other taxes," exempts from taxation all realty owned and used by the bank exclusively for banking purposes.

Cases cited and approved: Bank *v.* McGowan, 6 Lea, 703 (S. C., 104 U. S., 496) ; De Soto Bank *v.* Memphis, 6 Bax., 415.

7. TAXATION. *Assessment. Banks.*

Since the Act of 1873, Ch. 118, an assessment of taxes upon the capital stock of a bank is void. The assessment must, under this act, be made against the share-holders.

Cited : Acts 1873, Ch. 118; Code, $\S$ 646 (M. & V.) ; $\S$ 541c (T. & S.).

8. SAME. *Parties to suit to recover taxes of corporation.*

In a suit against a corporation for taxes, to which the share-holders are not parties, no judgment can be rendered against the latter.

9. CONSTITUTIONAL LAW. *Special legislation. Act, since 1870, changing name of a corporation.*

An act which merely changes the name of a pre-existing corporation, is not obnoxious to Art. XI., Sec. 8, of Constitution of 1870, providing that "no corporation shall be created or its powers increased or diminished by special laws."

Cited : Constitution (1870), Art. XI., Sec. 8.

Cases cited and approved: 97 U. S., 146; 107 U. S., 174.

FROM SHELBY.

Appeal from Chancery Court of Shelby County. JOSIAH PATTERSON, Sp. Ch.

SMITH & COLLIER for Complainant.

TAYLOR & CARROLL, T. B. TURLEY, and MORGAN & McFARLAND for Respondent.

FOLKES, J.　This is a bill filed by the Receiver and Back-tax Collector of the late city of Memphis for the benefit of the creditors of said city, under the acts of the Legislature repealing the charter of the city, and providing for the collection of back taxes, and application of the proceeds thereof to the payment of the debts of said city.

The object of the bill is to collect from the Bank of Commerce taxes claimed to be due the city for the years 1873, 1875, 1876, 1877, and 1878 upon the bank building and lot upon which it is situated, and upon the capital stock of said bank, which capital is said to be $200,000. The amount charged as due is placed at about $35,000.

The bill sets out the legislation under which the Bank of Commerce is said to claim to do business, and under which it asserts an exemption from taxation other than as therein provided.

This legislation, briefly stated, is as follows:

Act passed February 29th, 1856: Benjamin Chandler and his associates were created a body-politic and corporate, under the name of the Chattanooga Savings Institution, with all the usual powers of a corporation, authorized to engage in the banking business at the city of Chattanooga, with all the rights and privileges incident to banking, except that it was prohibited from issuing notes or other circulating media.

Section 2 provided that "the capital stock of said company shall be divided into shares of fifty dollars each; and when two hundred shares shall have been subscribed, and the sum of one dollar per share paid thereon, the stockholders may meet and elect five directors, who shall serve," etc.

Section 3. Among other things, that said company "shall pay to the State an annual tax of one-half of one per cent. on each share of capital stock, which shall be in lieu of all other taxes."

By an act passed November 15th, 1859, the Chattanooga Savings Institution was authorized to remove it situs to Memphis.

And on February 12th, 1866, the Legislature authorized the name of said institution to be changed to "The Savings Bank of Memphis."

And by Act of March 12th, 1873, the name was again changed to "Bank of Commerce."

The bill charged that there had never been any organization of said bank; that the charter had been sold by the first incorporators to one Richmond, who, without organization, did business at Memphis for awhile, and then one Wicks' did the same until January, 1873, when he sold the charter to the Merchants' Insurance Company, of Memphis, the stockholders of which formed the present organization of the Bank of Commerce; that in consequence of such sales of the charter the said Bank of Commerce acquired none of the rights and privileges conferred by said original act, and

especially that it did not acquire the exemption
from taxation as claimed; that, even if it be able
to make out corporate succession and existence, it
is not entitled to any exemption on its stock, by
reason of the fact that there was no stock in ex-
istence until after 1870, and under the Constitu-
tion of that year there can be no exemption from
taxation upon the stock issued since that time.

It is also claimed in said bill that while there
is no valid issue of stock in said bank for want
of corporate existence, there is a liability for taxes
on the amount of capital wrongfully employed by
it in its business, just as there would be against
private individuals who were engaged in banking
under an assumed corporate name.

Other allegations of the bill, where necessary,
will be stated in the further consideration of the
cause.

There was a demurrer interposed by the bank,
which was sustained by the Chancellor and over-
ruled by this Court at a former term, the points
then adjudged being that, while the forfeiture
of a charter of incorporation can only be had
by direct proceedings on behalf of the State for
that purpose, third parties, dealing with the cor-
poration, may inquire into its powers and obli-
gations; and that the transfer of a mere *charter*,
containing a stipulation for exemption from general
taxation, does not confer the franchise upon the trans-
feree; and that while a State, by its Legislature,
may change the name of a corporation, and to

this extent recognize its then existence as a corporation, it does not thereby assure to it any other or different franchises than those which it is at the time of such recognition entitled to.

See the opinion then rendered herein, as reported in 15 Lea, p. 104.

There being no special rulings upon the sundry grounds of demurrer other than is involved in the above statement of the points adjudged, there is nothing else concluded, and the case went back for answer with all other questions open. *Battle* v. *Street,* 1 Pickle, 291.

The answer denies all the charges of the bill upon which a liability for taxes is predicated, except for so much of its bank building as is not used for banking purposes, tax upon which it claims to have paid; pleads estoppel and *res adjudicata,* as to corporate succession, organization, and exemption, setting out specifically the several cases in this and in the Supreme Court of the United States upon which said pleas are predicated; claims that as a matter of fact there has been corporate organization, and regular corporate succession from the original incorporators down to the present time; sets up the Act of 1873, which provides that capital stock in a bank shall not be assessed against the bank, but against each stockholder for the shares held by each, even if it be that the capital stock in this bank can be taxed at more than one-half of one per cent.

Upon the coming in of the answer, much proof

was taken, mainly on the question of organization and issuance of stock and corporate succession.

Upon the hearing the bill was dismissed, the complainant has appealed, and the whole case is before us.

It will be noticed from the above meager summary of the case that many questions are presented for consideration, all of which have been pressed and combated with great vigor and ability by learned counsel.

We will now examine such of these questions as are, in our opinion, controlling.

In the first place, it may not be out of the way to say that, whatever may be our opinion of the power of the Legislature in the granting of a charter of incorporation providing for the exemption from taxation of the property of such corporation, so as to tie the hands of succeeding Legislatures from imposing an equal share of the burthens of maintaining the government upon such corporation as the exigencies of the State may require, if the question were before us for the first time, it is now too well settled by repeated decisions that such provisions create a contract (the acceptance of which by the corporators, who invest their money upon the faith thereof, furnishing a valid consideration), the obligation of which cannot be impaired, for us to attempt to disturb or review them here.

So that, if we find there has been an organization of this corporation, chartered in 1856, that there

has been succession of corporators, with authorized change of name, the right of the present organization to the exemption from all other taxes upon its capital stock and property necessary to the conduct of its business upon paying one-half of one per cent. upon its capital stock, nothing else appearing, may be considered as not open to debate. *In re Union and Planters' Bank*, 13 Lea, 407.

On the subject of organization and succession, as already stated, there is much proof, and there is no little confusion and some contradiction, but in our opinion the weight of the proof establishes the fact of organization, under the original charter; for the transfer to W. B. Richmond and his associates was made by the president and directors, who could not have been elected as such, under the charter, until there had been two hundred shares subscribed, and the sum of one dollar per share paid thereon.

Much stress is laid on the fact that it is not shown that certificates of stock were issued and transferred. While this is a circumstance that may be looked to in arriving at the good faith of the parties, and in determining the true nature of the transaction as to whether it were a transfer of stock so as to carry succession to the purchasers, or a mere sale of the *charter*, it is by no means conclusive.

The issuance of certificates of stock is non-essential, either to the validity of the original organization or to the transfer of same to pur-

chasers. The subscription to and payment for stock is all that is necessary. *National Bank* v. *Watsontoun Bank,* 105 U. S., 217; Cook on Stocks and Stockholders, Sec. 10, and cases there cited.

The fact that the witness, B. Richmond, who, speaking from his diary, says that he "got the charter of the affair," at this late day referring to a transaction had over a quarter of a century ago, cannot be taken as evidence that he got nothing else. The fact that he got the charter was emphasized because it was the thing of value sought, but does not show that he did not obtain the subscribed stock upon which the organization was predicated. He says the transfer was signed by the president, and that while it had done no business it had organized; getting all the stock, of course he got the charter.

After this purchase, and the act authorizing its removal to Memphis, there is no doubt, from the proof, but that the organization was kept up, and stock subscribed in the new company, and stock books kept, and certificates of stock made out and signed; whether issued or not does not appear, but this is immaterial.

This organization was maintained, and banking business carried on, until the occupation of the city of Memphis by the Federal military forces, when its officers and owners removed, with its assets, South, following the fortunes of the Confederate government.

After the war, we find B. Richmond the owner

of one-fourth interest in the institution, as the legatee under his brother's will, and J. W. Crocker the owner of another one-fourth, both of which were transferred for value to M. J. Wicks, who seems then to have held the remaining interest, and continued the business. The name of the institution being changed under the Act of 1866, the proof, beyond question, shows a regular banking business conducted by Wicks and his associates from that time to the failure of the bank in October, 1872, when an assignment of all of its assets was made for the benefit of its creditors.

There is some contradiction as to the amount of the stock in this last organization, one witness putting it at $100,000, of which Wicks is said to have owned $60,000, and the remaining $40,000 is said to have been held by New York parties, while on the other hand the stock is sometimes spoken of as $30,000, and sometimes as $60,000. Be the true amount what it may, there is no doubt but what there were stock subscriptions, and a regular organization by election of directors and officers, and regular banking business conducted until October, 1872.

How this stock is thus made to fluctuate, whether from want of recollection of the facts on the part of the witnesses, or because of the improper conduct of the parties owning it, in the effort to accomplish some private purpose, is alike immaterial to the question of corporate existence, whatever may have been the rights of the indi-

viduals as stockholders or creditors, as affected by said changes. It is certainly not sufficient to establish the contention that there were no stock subscriptions and organization . in the face of the direct proof of Tate and McClure; and it only serves to show that there were no stock certificates issued, the stock being held almost entirely by Wicks, who seems to have presented to his friends enough stock to qualify them as directors.

The bank, after its failure, paid all of its debts, either out of the assets assigned to Parker for that purpose, or with the assistance of Wicks from his private means.

But it is said that, if under the proof, and the presumptions Courts may indulge, where a corporation is found in the exercise of its corporate franchises, in favor of its due organization, after a lapse of time, and where there have been legislative recognitions of its existence, there is at least one link in the chain of defendant's title which is fatally defective, to wit: the transfer from Wicks and others, made in January, 1873, to the parties who reorganized the bank and are now conducting the same under the name given it by the Act of March 12th, 1873.

Let us see what are the facts. The written transfer shows that on January 31st, 1873, W. J. Wicks, W. C. McClure, Samuel Tate, W. B. Greenlaw, and W. R. Cunningham, describing themselves as owners and holders of the six hundred shares of , the *present* capital stock of the Savings Bank

of Memphis, for value received, sell, assign, and transfer to E. McDavitt and others, as trustees for the stockholders of the Merchants' Insurance Company, the said six hundred shares of the present capital stock of said Savings Bank of Memphis, together with all the franchises, rights, and privileges of said Savings Bank.

Said paper, continuing, guarantees said purchasers, on the resumption of business by said Savings Bank, under its present or any new name, against any debts now existing against said bank, each signer limiting his guarantee to his *pro rata* share of stock transferred, without stating what that share was.

After this purchase and transfer, the stockholders of the Merchants' Insurance Company, to the amount of $200,000—that being the full amount of its capital stock—subscribed to $200,000 of stock in the Bank of Commerce, to which name, as we have seen, the bank had been in the meantime changed, and paid for the latter subscription all of the assets of the insurance company, consisting of notes, securities, etc., estimated as actually worth eighty-five cents on the dollar, and paid in the remaining fifteen per cent. in cash, each stockholder subscribing for the exact amount in the bank that he held in the insurance company, the latter stock having been placed in the hands of Parker, the secretary, to be cancelled; and upon the cancellation of this stock, certificates of stock in the bank were issued to the subscriber.

With the $200,000 of new capital thus sub-scribed and thus paid in, the bank regularly organized, and has continued business from that time to the present.

For the complainant it is urged that the trans-action just detailed was a merger of the bank into the insurance company, or was a sale by the bank of all its stock to the Merchants' Insurance Com-pany for the purpose of carrying to the latter its corporate entity and franchises, to enable the in-surance company to control the organization and to become a bank, and that the mere interposi-tion of the directors as trustees to hold the stock does not change the effect.

The legal proposition advanced is sound. There is no doubt but that the insurance company had no power to purchase, and the bank no power to sell, so as to vest all the stock and franchises of the latter in the former, there being no express authority to do so in either charter, nor by any additional legislative grant or provision. Green's Brice's Ultra Vires, 116; Cook on Stocks, etc., Sec. 60, pp. 315–317.

And it is equally true that if the purchase was by the one corporation for the purpose of controll-ing or absorbing the other, the mere interposition of the directors as trustees would not validate the transaction. *Central Railroad Co.* v. *Pennsylvania Railroad Co.*, 31 N. J. Eq., 475.

But in our view of the facts, a case is not made out for the application of the law advanced.

State *v.* Butler.

Counsel seem to assume that the trustees were such for the insurance company, when the paper itself shows that McDavitt and others, to whom the sale and transfer was made, were trustees for the *stockholders* of the insurance company, and not for the corporation. We know of no principle of law that would prevent the stockholders in an insurance company from becoming at the same time stockholders in a bank, even where the same stockholders own all the stock in the two corporations.

Now, this record fails to show any effort or purpose on the part of the one corporation to absorb or manage the affairs of the other; but everything that was done was by individuals, as such, and in good faith.

A number of gentlemen who are stockholders in an insurance company purchased all the stock in a suspended bank having a charter which it is thought confers very valuable franchises, and conclude that the $200,000 they have in the insurance company can be used to their greater individual profit if invested in the bank; they thereupon subscribe this amount to stock in the bank, and wind up the business of the insurance company, using their respective assets in the latter for the purpose of paying their subscription to the former; and as the actual value of these assets only pay eighty-five per cent. of their respective subscriptions, they pay the balance in cash.

We can see no legal obstacle to such a consummation.

So that if the Savings Bank of Memphis had a valid corporate existence at the time of its failure in October, 1872, there was nothing to prevent its stock from being sold in January, 1873, to McDavitt and his associates, nor to prevent the purchasers from making good the impaired capital and increasing the amount thereof (provided under the original charter there was a right to increase), and resuming business.

The mere insolvency of a corporation will not work a dissolution, nor will the assignment of all of its property, nor the appointment of a receiver, extinguish the franchises with which the company has been invested, where there have been no proceedings for forfeiture inaugurated by the State, nor a surrender by act of the stockholders. *Corban* v. *Boston Papier-mache Company*, 10 Gray, 245; *Bickerhof* v. *Brown*, 7 Johns. Ch., 217.

We hold, therefore, that there has been an acceptance of the charter as granted in 1856; that there has been corporate organization and succession; and that the defendant company is a duly organized banking institution, with all the powers, privileges, and immunities possessed by the Chattanooga Savings Institution under the charter of 1856.

In addition to what has already been said as the basis of the conclusions reached as to organi-

zation and succession, it should be remarked that most, if not all, of the criticism made by counsel for complainant upon the defect in the proof as to such organization and succession is met by the legal effect of the repeated legislative recognition of this corporation by the several acts to which we have referred.

Well-considered cases have gone so far as to hold that when the existence of a corporation has been recognized by acts of the Legislature, all inquiry into the original creation of the corporation is precluded. *Society for Propagation of Gospel* v. *Pawlett*, 4 Pet., 480; *Matter of N. Y. Elevated R. R. Co.*, 70 N. Y., 338.

Again: it becomes by such recognition *ipso facto* a legal corporation, and any defect or irregularity in the proceedings required by law to be taken for its organization will be deemed to have been waived. *Black River & Utica R. R. Co.* v. *Barnard*, 31 Bar., 258; *Atlantic & Pacific R. R. Co.* v. *St. Louis*, 66 Mo., 228; *Turnpike Co.* v. *Davidson Co.*, 3 Tenn. Ch., 396.

In which last case it is said by Judge Cooper, that "after repeated recognitions of the existence of a turnpike corporation up to and inclusive of the last Legislature, a collateral impeachment of its existence, based on pre-existing facts, cannot be entertained." See also Waterman on Corp., Sec. 42.

Of course we do not mean to be understood as placing any stress upon the legislative recognition by the Act of March 12th, 1873, as aiding in the

conclusion that there is a valid corporate existence of the Bank of Commerce · to-day; for it is manifest that if the Savings Bank had no valid existence prior to 1870, it could acquire none by legislative act since the Constitution of 1870, which provides that "no corporation shall be created, or its powers increased or diminished by special laws." But the change of name by special act of an existing corporation does not fall within the inhibition of the constitutional provision referred to, as such change of name does not involve, in any sense, a creation of a corporation, nor the increase or diminution of corporate powers. *Wallace* v. *Loomis,* 97 U. S.; *Jones* v. *Haversham,* 107 U. S., 174.

The Bank of Commerce, therefore, with a valid organization and succession, possesses the franchises— including the exemption from all other taxes, except one-half of one per cent. upon its capital stock—to the same extent, no more and no less, that were possessed by the Chattanooga Savings Institution under the original charter.

The question, much discussed at the bar, as to the increase of the capital stock, in which it is insisted on behalf of the complainant that the second section of the charter limits the amount of capital to two hundred shares of fifty dollars each; or, if mistaken in this, that it can only be increased by deposits being converted into stock, under the privilege given to depositors in section four of the charter; or, if mistaken in this, that

State *v.* Butler.

when once fixed by the corporation it cannot be increased for want of express power in the charter to increase amount of capital; and, finally, that if wrong in this, the stock cannot, since the Constitution of 1870 prohibiting exemptions from taxation, be increased beyond the amount issued prior thereto; the insistence on behalf of the defendant being that the two hundred shares named in the second section is a minimum, and not a maximum, designation, and that, there being no maximum, the stock can be increased from time to time by the corporation, as the necessity of its business may reasonably require, after as well as before 1870, the acceptance of the charter with no fixed limit upon its stock, constituting a contract the obligation of which cannot be impaired by constitutional provision any more than by legislative enactment. These questions, we say, are not necessary to be determined in the view we have taken of the case under the state of the pleadings.

The bill charges, and the proof shows, that the assessment upon which the tax is now sought to be collected was against the bank and upon the capital thereof.

No recovery can be had upon such an assessment since the Act of 1873, carried into T. & S. Code, § 541c, which provides that "no tax shall hereafter be assessed upon the capital of any bank or banking association * * * organized under the authority of this State or of the United States; but the stockholders in such banks *

\*    \*   ·  shall be assessed and taxed on the value of their shares of stock therein," etc.

So that this bill must fail, so far as the same seeks to recover taxes upon the capital stock, whether the amount of the capital be ten thousand dollars or two hundred thousand dollars, when we adjudge that the defendant bank is duly organized as the successor of the Chattanooga Savings Institution, none of the stockholders being sued.

It is ingeniously sought to evade the effect of this statute by the charge that the bank, having no charter authorizing its present organization, all so-called stock is void as such, or that if it were entitled to only ten thousand dollars of stock, all in excess of that amount is void, and becomes so much money or property or capital embarked in a private enterprise by individuals who assume to act under a corporate name, and, as such, is taxable.    To all of which the answer is obvious:

*First*—To the extent of the minimum amount of stock, in any event, we have held the charter valid and organization perfect.

*Second*—As to the unauthorized excess of stock, if it be unauthorized, it cannot be reached by this bill, for the twofold reason that the assessment, which is the cause of action here, is not against the individual owners of such surplus; and if it were an assessment against them individually, none of them are parties to this suit.

So that in no event can there be any recovery

here for taxes claimed to be due on the capital stock of the bank. But the inquiry remains, Can the real estate of the bank be subjected to taxation for the years stated in the bill?

The question was practically answered when we held the defendant was duly organized as the successor of the Chattanooga Savings Institution, with whatever exemptions and privileges were possessed by that institution; for we find under section four of the charter such real estate as is necessary for a suitable place of business may be purchased and held by the bank, and upon well-settled authority the provision that the bank "shall pay annually one-half of one per cent. on each share of its capital stock, which shall be in lieu of all other taxes," operates to exempt so much of the real estate owned by it as is actually used for the purpose of its banking business.

Indeed, the identical question is so held in the case of *The Bank* v. *McGowan*, 6 Lea, 703; affirmed in 104 U. S., 496. See also *De Soto Bank* v. *Memphis*, 6 Bax., 415.

The record shows that the bank has paid all taxes on so much of said real estate as is not actually used by it in the conduct of its business as a banking house.

Without reference to other questions that have been discussed by counsel, and without further elaboration, the decree of the Chancellor, dismissing the bill at complainant's cost, will be affirmed.

Chief Justice Turney is of opinion that the transfer to McDavitt and his associates by Wicks and others is invalid, and considers the real estate therefore taxable. In other respects he concurs with the opinion of the majority.