—— CARTWRIGHT *v.* DICKINSON.

## (*Nashville.* February 4, 1890.)

1. CORPORATIONS. *Subscription to initiatory stock becomes absolute, when.*

The subscription to the original or initiatory stock of a corporation becomes absolute and irrevocable at that instant when all pre-requisites made essential by law to the granting of the charter have been complied with. The *subscriber* then becomes a *share-holder*—liable absolutely for his subscription, and entitled to membership and to a voice in all subsequent proceedings affecting the interests of the corporation.

2. SAME. *No power to release share-holder except by consent of all.*

No power resides in the corporation, its officers or directory, to release a share-holder from payment of his stock subscription after his liability has become absolute. That can be effected alone by consent of all the share-holders, rights of creditors being out of the way.

3. SAME. *Forfeiture of shares for non-payment of calls.*

No power exists to declare forfeiture of shares for non-payment of sub-scription calls unless it is expressly conferred upon the corporation by statute. *A fortiori*, mere failure to pay calls will not work a forfeiture.

Case cited and approved: Chase *v.* Railroad, 5 Lea, 415.

4. SAME. *Unauthorized release of share-holder not aided by supplying his place by new subscriptions.*

An unauthorized release of a share-holder from payment of his sub-scription, by the action of the corporation or its officers, is not aided or made effectual by reason of their having procured new and additional subscriptions to take the place of that released. And it is wholly immaterial, upon this point, whether the new and additional subscriptions be void or valid.

5. SAME. *Subscriptions taken in excess of the fixed capital stock void.*

Additional subscriptions to the capital stock of a corporation are abso-
lutely void, where the amount fixed by its by-laws as its capital stock
had been previously taken and subscribed.

Question reserved: Are such additional subscriptions void if taken
pursuant to a by-law increasing the amount of capital stock after it
had once been fixed, when there has been no amendment of charter
authorizing such increase?

Acts cited: Acts 1875, Ch. 142; Acts 1883, Ch. 163.

6. SAME. *Priority of original over additional subscriptions.*

If the additional subscriptions be treated as valid, yet the original sub-
scriptions would be entitled to priority of right.

Case cited: 105 U. S., 143.

7. SAME. *No power to reduce capital stock by purchase of shares.*

A corporation has no power to reduce the amount of its authorized
capital stock by purchase of its own shares for cancellation.

Case cited and distinguished: Sligo *v.* Jackson, 1 Lea, 210.

8. SAME. *Violation of charter no defense to suit for subscription.*

That a corporation has exceeded or violated its charter rights by taking
stock subscriptions in excess of its fixed capital stock, or by other
illegal acts, affords a share-holder whose subscription is legal and
valid no defense to a suit by the corporation to recover of him such
subscription.

9. SAME. *Share-holder not released from liability for his subscription by
reason of his own mistake.*

A share-holder is not released from his liability for his subscription,
where, on account of his own or his agent's mistake of law or fact, he
supposed his contract of subscription had been properly canceled,
and for that reason ceased to act as share-holder in the corporation,
although the corporation became insolvent through its subsequent
management, in which he did not participate.

Case cited: 91 U. S., 80.

10. SAME. *Same. Officer of company becomes agent of share-holder, when.*

An officer of a corporation who undertakes for a share-holder to obtain
a release or cancellation of his subscription, becomes, as to that

matter, the agent of the share-holder. And the share-holder, not the corporation, must assume responsibility for the acts of such agent.

11. SAME. *Issuance of stock certificates not essential.*

It is not essential that stock certificates should issue to a share-holder in a corporation. His rights are the same with or without issuance of such certificates.

Cases cited and approved: Butler *v.* State, 86 Tenn., 614; Cornick *v.* Richards, 3 Lea, 1; Young *v.* Iron Works, 85 Tenn., 189.

12. SAME. *General assignment by insolvent corporation passes unpaid subscriptions.*

Under a general assignment of its assets by an insolvent corporation, for the benefit of its creditors, unpaid subscriptions due from delin‐ quent share-holders pass to the assignee; and it is his duty to collect them and pay the proceeds to creditors, or, in case of a surplus, to the assignors.

13. SAME. *Same. Assignee's right of action not lost, when.*

The assignee's right to recover such subscription is not defeated or lost when, with his permission, the share-holders other than such de‐ linquent reorganized the corporation and resumed business, issuing and selling preferred stock and borrowing money, thereby paying some of the debts and acquiring assets sufficient to meet the others.

Question reserved: Whether such preferred stock is valid as against share-holders assenting to its issuance, it appearing that it was issued by authority of a by-law, increasing the fixed capital of the corpora‐ tion, passed without an amendment of the charter.

---

FROM DAVIDSON.

---

Appeal from Chancery Court of Davidson County. ANDREW ALLISON, Ch.

WHITMAN & GAMBLE and E. B. RUCKER for Cartwright.

DICKINSON & FRAZER for Dickinson.

LURTON, J. The Grubbs Cracker Company is a corporation organized July, 1885, under the general incorporation law of this State. In October, 1887, being insolvent, it made a general deed of assignment to Dickinson, as trustee, to equally secure all creditors. The original bill was filed by Cartwright, claiming to be a creditor of the corporation, for the purpose of enforcing payment out of the assets in defendant's hands. One of the demands set up is not now resisted; the other is contested as being without consideration. The assignee, after answering, filed a cross-bill to recover some $6,000 alleged to be due upon unpaid calls on stock owned by Cartwright in the cracker company, and to recover $1,000 paid back to him by the secretary and treasurer of that company upon an alleged ineffectual cancellation and rescission of his liability as a subscriber for stock. Cartwright, before the charter was obtained, subscribed for $8,000 of the stock of the proposed corporation. A charter was obtained by the usual application, provided by the Act of 1875. The subscribers thereupon met, and organized by accepting the charter, adopting by-laws, and electing directors. He was present at this meeting, and was elected a director, and acted as such for a year thereafter.

The Act of 1875 does not require the amount
of the capital stock of a corporation to be stated
in the application for the charter, but authorizes
the capital to be fixed subsequently by by-law.
Such a by-law was adopted at the organization,
and the capital settled at $40,000, to be divided
into shares of $100 each. A few days thereafter
Cartwright paid the first call of 25 per cent.,
amounting to $2,000, and took the receipt of the
secretary and treasurer for that sum as a pay-
ment upon his stock. The remainder of the sum
due ($6,000) he has never paid, and now claims
that his contract has been canceled or rescinded,
and that he is not liable therefor. The facts upon
which this defense is placed are these: In July,
1886, one year after the company had begun busi-
ness, Cartwright, desiring to withdraw therefrom,
spoke to Mr. Grubbs, and asked him to dispose
of his stock. Grubbs was the brother-in-law of
Cartwright; was the largest stockholder in the
corporation, and was its secretary, treasurer, and
general manager. Grubbs, it seems, did accord-
ingly undertake to dispose of his stock, which
appears at that date to have been salable at par.
September 2, 1886, Grubbs told him he had made
a disposition of the shares, and by his direction
the proper entries were made on the books of the
company, by which the balance due as for unpaid
calls was charged off, and the $2,000 theretofore
paid in on first call was credited to the personal
account of Cartwright. Of this credit $600 was

then paid in cash, same being credited on the stock receipt previously taken for amount of first call. Subsequently this receipt was surrendered, and the note of the corporation executed to Cartwright for the remainder. This note was afterward reduced by payments and a new note executed, which is the smaller of the two demands upon which the original bill is filed.

What Grubbs did, which he supposed authorized him to rescind the contract by which Cartwright had purchased shares, was this: He went upon the streets and solicited *new* subscriptions to the stock of his company, and, when he had obtained these, he regarded himself as authorized to rescind the contract of Cartwright, and release him from all obligation as a share-holder indebted on account of his shares. To carry out his purpose he caused the books to show that Cartwright, instead of being debtor, was a creditor to the extent of the capital which he was allowed to withdraw.

The proof does not show any transfer of Cartwright's stock to other persons, or any agreement that it should be transferred to others, or that they should be substituted to his rights and liabilities. There is no pretense of the purchase of shares from Cartwright by other persons. On the contrary, they were procured to subscribe for *new shares*, just as Cartwright had done in the first instance.

Before the organization of the corporation and

31—4 P

acceptance of the subscription of Cartwright, the promoters might, perhaps, agree to release a subscriber by substituting other names for his, and erasing from the list that of the recalcitrant. Cook on Stock, Sec. 75. But at the moment when the conditions required by law as preliminary to the granting of a charter were complied with, the subscribers became *share-holders*, entitled to a voice as share-holders in all subsequent proceedings, and to compel a specific performance of the contract of membership. At the same time all the obligations of a share-holder were assumed, and the liability to pay the amount of the shares became fixed and absolute. This liability to pay calls as they should be made upon the shares is a mere incident of membership, and the fact that such payments have not been made does not affect the status of the member as a share-holder until a forfeiture has been declared in such manner as provided by the charter. The fact that certificates of shares have not been issued does not affect the question. Such certificate is never essential to constitute one a share-holder, being mere evidence of the ownership of shares. 1 Mor. Corp., Sec. 56, and cases cited.

This view of the effect of a certificate has been heretofore settled in this State. *Cornick* v. *Richards*, 3 Lea, 1; *Butler* v. *State*, 86 Tenn., 621; *Young* v. *Tredegar Iron Works*, 85 Tenn., 189.

It follows that Cartwright was the owner of eighty shares of the capital stock of this corpora-

tion.    This stock he has never assigned or trans-
ferred to any other person.  No other person claims
to own his stock, or to be in any way legally or
equitably entitled to have it transferred to them.
The cancellation of his subscription was inopera-
tive to cancel his shares or discharge his obliga-
tion to pay for them.    Unless the charter author-
izes a forfeiture of shares for non-payment of calls,
there is no power in the corporation to forfeit,
cancel, or annul shares once lawfully issued.    The
contract of share-holders is a mutual one.    With-
out the consent of all one cannot be released from
liability.    Even a board of directors cannot dis-
charge the contract of a share-holder to pay
for his shares according to his contract, or dis-
franchise him by a forfeiture declared without ex-
press authority of law.    *Chase* v. *Railroad*, 5 Lea,
415; Mor. Corp., Sec. 309, and cases cited.

The argument that if in fact the corporation
received from these new subscribers the same
amount of money which Cartwright was to con-
tribute, that, in that case, what was done would
in effect be the substitution of the capital of one
for that which another was bound to contribute is
plausible, but is unsound in law, and unsustained
by the facts of this case.    Unsound in law be-
cause the mere fact of obtaining certain new and
original capital cannot operate to empower the
corporation to return capital theretofore embarked
in the enterprise.    These new subscribers, by their
subscription, undertook to contribute *additional*

capital, and not to substitute their capital for money to withdrawers. This was not their engagement. This is the difference between the purchasing of Cartwright's shares and the subscribing for new shares, and the distinction between the effect of buying shares already issued and subscribing for new shares. In the latter case new capital is contributed, while in the former only the legal title of shares is changed. The new subscribers, as well as the old, had a right to demand that every share-holder should be compelled to pay his shares up according to contract.

There was no more authority to cancel Cartwright's shares, and release him from his liability, after this additional capital was contributed than there was before. The contention is not sound in fact. Mr. Grubbs seems to have supposed that he had the right to release share-holders from their obligations just as suited him or them. He seems likewise to have supposed that he was authorized to take new subscribers to take the places of such as chose to withdraw, and to furnish new capital as the necessities of the business demanded. The share list shows several other share-holders, who, after experimenting with the cracker business, withdrew, and had their money returned. So, when Mr. Grubbs undertook to get new stock to take the place of old stock owned by Cartwright, he seems to have had other arrangements of the same sort to carry out; for he says that he got these new subscribers to " cover " Cartwright's stock, and

that of others to whom he had made the same promises.

The fact that the authorized limit of $40,000 had been reached, does not seem to have been any embarrassment whatever. He says he got an amount of new subscriptions, after he agreed to place Cartwright's stock, equal to his or greater. In this he is shown, by a careful examination of the stock list, to have been mistaken. The total of stock subscriptions July 1, 1886, was $50,000. The total in October, 1886, inclusive of Cartwright's, was about $57,000. Then, to cover Cartwright's $8,000, and that of others to whom he had made same promises, there could not have been over $7,000 obtained. Thus it is not even the case of money of a new subscriber having fully taken the place of an old one suffered to withdraw. That the corporation, at the time, had actually received the full sum of $40,000, and that that was the limit of its authorized capital, cannot avail Cartwright. If the shares subscribed after the limit of $40,000 had been reached were valid and lawful, then the corporation was entitled to a much larger sum than $40,000. If, on the other hand, these subscriptions were *void*, then they were not enforceable, and money actually paid could not be lawfully held if demanded by such subscribers, creditors out of the way.

If the transaction be looked at as a purchase of these shares by the corporation, then it is equally ineffective. Whatever power a corporation

may have to deal in its own shares for purposes of sale or to secure a debt, it is too clear for argument that it cannot reduce its authorized capital by purchasing its own shares for cancellation. Morawetz Corp., Secs. 111, 112, 113.

The case of *Sligo* v. *Jackson*, 1 Lea, 210, does not hold a contrary doctrine, as argued by counsel. The sale of stock sustained in that case was not a sale to the corporation, but to one Sloan, a stranger.

The next defense urged is, that the corporation has violated its charter by increasing its capital stock, and that it has already issued stock certificates in excess of its lawful capital, and that therefore it is not in the power of the corporation to issue valid shares to him. The capital fixed by by-law at $40,000 was, as we have already seen, exceeded by the action of Mr. Grubbs in obtaining subscriptions in excess of that limit. This was unauthorized by the share-holders or the directors. Such subscriptions for new shares, after $40,000 had been taken, were null and void. In February, 1887, the share-holders amended their *by-laws* so as to increase their authorized capital to $100,000. This was intended to legalize the excess of shares already taken and authorize a further increase. Under this amendment new stock was taken until the whole list reached about $76,-000. After the assignment to Dickinson, a scheme for the reorganization of their business was conceived, and the share-holders again amended their

by-laws so as to declare all stock theretofore issued common stock, and to authorize issuance of "*preferred*" stock to the amount of $30,000, this latter to have preference to the extent of six per cent. in payment of dividends over the common stock. It appears that, under this scheme, some $23,000 of "preferred" stock has been sold, thus bringing the total of shares, excluding Cartwright's, to something over $99,000. Neither of these amendments of the *by-laws* were made in pursuance of the Acts of 1883, page 212, concerning the amendment of charters so as to allow an increase of capital stock. The question as to whether the capital stock, having been once fixed by by-law as provided by general incorporation laws of 1875, can be increased without an amendment of the charter in the manner pointed out by the Act of 1883, is a grave one, and is reserved for the reason that in the view we have of this case it need not be decided. This question cannot affect Cartwright's liability to pay for his shares. By his subscription, as we have seen already, he became a shareholder. His shares are not affected by the subsequent issue of shares in excess of charter limit. If these shares were issued without power upon the part of the corporation to issue them, they are absolutely void, and confer no rights of membership upon those who hold them. In a contest between them and the holders of shares subscribed before the capital was all taken, they would be excluded from all participation in the management

or profits of the business. *Scovel* v. *Thayers,* 105
U. S., 143. That the corporation has been guilty
of a violation of its charter, in this or any other
matter, is no defense to an action for calls due
from a share-holder upon his shares. His remedy
was against the corporation to restrain such alleged
illegal action, or is against the agents personally, for
any wrong and injury done him. It furnishes no
reason why he shall not carry out his own con-
tract. The usual rule by which the breach of a
contract upon one side justifies its breach or aban-
donment by the other, has little application in
cases of this character. Mor. Corp., Sec. 116, and
cases cited.

The question as to whether the issuance of pre-
ferred stock was valid and effective as against
share-holders not assenting then or subsequently,
we do not determine. Operative or inoperative,
it does not affect the contract to pay for the
shares he became the owner of by his contract of
subscription. The fact that he has not had notice
of subsequent meetings of share-holders, or oppor-
tunity to attend or protect himself against action
of the other share-holders affecting value of his
stock cannot operate to release him from his con-
tract. Neither the directors nor the share-holders
had any knowledge of the arrangement by which
he supposed he was released.

In January, 1887, several months after his ar-
rangement with Mr. Grubbs had been perfected,
the latter informed the board of directors that

Cartwright *v.* Dickinson.

there was a vacancy in the board, Mr. Cartwright, having *sold* his stock. This vacancy was thereupon filled. The directors and share-holders thereafter assumed that his shares had been in fact sold to others. Grubbs, in so far as he undertook to dispose of his shares, was the agent of Cartwright in such disposition. If Cartwright was misled and deceived by the statement of Grubbs that he had sold his shares, and thereby lulled into a course of action or non-action whereby he has suffered, he can look only to his agent for indemnity. If, on the other hand, he knew the exact facts upon which Grubbs assumed authority to cancel his shares, and acted either upon the opinion of Grubbs or his own opinion, or their concurrent opinions that upon such facts the law empowered Grubbs to do what he did do, and had a legal right to release him from his contract, then both mistook the law. That a share-holder should release himself from liability to pay for his shares by proof that he was misinformed as to a fact by his own agent, or misled as to the effect of certain known facts upon his contract, or was ignorant of the law which prevented any share-holder from being released, or his subscription canceled, without the consent of the other share-holders, would be a most disastrous doctrine. The rule that a mistake of law does not relieve in equity any more than at law is well settled. *Upton* v. *Trebilcock*, 91 U. S., 80.

The next and last assignment of error necessary

to consider is that this action cannot be maintained by Dickinson as assignee. This assignment of error is based on the facts that subsequent to the assignment by the corporation the share-holders other than himself, with means raised by issuance of the preferred stock heretofore mentioned, and with borrowed money, compromised the greater part of the debts of the corporation, and that the assignee has suffered them to resume business with the machinery assigned to him, they having given bond for his protection. The assets thus in their hands are probably abundant to pay such creditors as have not yet been settled with. The only effect of this is to strip the assignee of any advantages, which creditors might be supposed to have in a suit to compel a share-holder to pay his calls, over the same action by the corporation. We have accordingly treated each question just as if it were a controversy between Cartwright and the Grubbs Cracker Company. That Dickinson is entitled to maintain this suit follows from the fact that he has not resigned his trust, and that there are creditors whose claims he must provide for. This claim is an asset in his hands, and it, together with other assets, remains in his control as trustee, and he may, and ought, reduce them to money and pay off remaining creditors and account for surplus to the assignors.

The decree of the Chancellor must be affirmed with costs.