#### IN THE

# SUPREME COURT OF TENNESSEE

#### AT THE

## WESTERN DIVISION

### APRIL TERM, 1921.

---

DARNELL-LOVE LUMBER CO. *v.* R. J. WIGGS.

### (*Jackson,* April Term, 1921.)

1. **APPEAL AND ERROR.** Findings of chancellor and court of civil appeals on question of duress not conclusive on supreme court.

   Findings of the chancellor and court of civil appeals on a question of duress exerted by defendant on complainant are not conclusive on the supreme court, the inquiry presented being one of law and fact. (*Post, pp.* 118-125.)

   Cases cited and approved: Black v. State, 130 Tenn., 533; Cartwright v. Dickinson, 88 Tenn., 476; Herring v. Ruskin Co-op. Association (Ch. App.), 52 S. W., 327; Whaley v. King, 141 Tenn., 1; Miller v. Ins. Co., 92 Tenn., 167-176; Green v. Ashe, 130 Tenn., 615.

   Cases cited and distinguished; Civil Service Investment Association v. Thomas, 138 Tenn., 77; Trevor v. Whitworth, L. R. 12 App. Cas., 409.

(113)

144 Tenn.—8

2. **CORPORATIONS.** Stockholder seeking to be relieved from con-
tract for sale of stock to corporation on ground of duress must
clearly show it.

Complainant, seeking relief against his contract for sale of stock
in a corporation to the company as procured by duress on him,
must clearly show that he was so coerced or unduly influenced
as to destroy his free agency in completing the transaction, and
that on subsequent deliberation with the advice of counsel he did
not fully ratify it. (*Post, pp.* 118-125.)

3. **CORPORATIONS.** Complainant, seeking to rescind sale of stock
to company for duress, not entitled to recover shares disposed of
by company prior to suit.

In a suit by a stockholder in a company to set aside his sale of its
stock to it on the ground the contract was procured by duress
exerted on him, complainant, if entitled to rescind, cannot recover
a number of the shares of his stock disposed of by the company to
purchasers prior to the suit, the holders of such stock not being
before the court, and any direction, seeking cancellation of such
stock or its return to the company, being necessarily futile. (*Post,
pp.* 118-125.)

4. **CORPORATIONS.** Companies cannot purchase own shares unless
expressly authorized.

Unless expressly authorized, corporations have no power to pur-
chase shares of their own stock, and contracts with such effect
are in contravention of the public policy of the State. (*Post.
pp.* 118-125.)

5. **CONTRACTS.** Corporations. Rule that where parties in pari
delicto in illegal contract plaintiff cannot secure rescission subject
to exception of cases where public good promoted by granting re-
lief.

The rule that, where the parties are *in pari delicto* in an illegal
contract, the condition of defendant is the more powerful, and
plaintiff cannot rescind, is of general application, where the il-
legal contract involves no consideration of the public welfare,
but an exception to the rule is found in cases where the public

Darnell-Love Lbr. Co. v. Wiggs.

good is to be promoted by permitting a disaffirmance of the contract and recovery of the consideration paid, though in so doing a party to its illegality may be benefited, such a contract being one between a stockholder and his corporation for sale to it of its own shares; the stockholder subsequently seeking to rescind. (*Post, pp.* 125-127.)

Cases cited and approved: Rucker v. Wynne, 39 Tenn., 618-623; Porter v. Jones, 46 Tenn., 314-327; Johnson v. Cooper, 10 Tenn., 529-530.

Case cited and distinguished: Hale v. Sharp, 44 Tenn., 275-281.

6. **CORPORATIONS.** **Company entitled to disaffirm illegal contract for purchase of own stock and stockholder entitled to recover stock.**
Where a corporation makes an illegal contract to purchase its own stock from its stockholder, the company is entitled to disaffirm the contract, and on return of the stock to recover the consideration paid; likewise where the stockholder seeks to restore to the company its improperly diverted funds, and to have returned to him the identical stock unlawfully acquired from him by the company, and this may be accomplished, the policy of the State is to be best subserved by granting relief to the stockholder. (*Post, pp.* 127, 128.)

Case cited and approved: St. Louis, Vandalia & Terre Haute R. Co. v. Terre Haute & I. R. Co., 145 U. S., 394.

Case cited and distinguished: Harriman v. Northern Securities Co., 197 U. S., 244.

7. **CORPORATIONS.** **Defenses of ratification and estoppel not available to company sued by stockholder for rescission of purchase of own stock.**
In suit by a stockholder to rescind sale of his stock to the company, the defenses of ratification and estoppel cannot avail defendant company to supply its want of power to purchase its own stock; the conduct of the parties cannot be held to have the effect of legalizing that which the policy of the law declares illegal. (*Post, p.* 128.)

GREEN, J., and E. J. SMITH, Special Judge, dissenting in part.

FROM SHELBY.

Appeal from the Chancery Court of Shelby County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—Hon. I. H. Peres, Chancellor.

Fitzhugh, Murrah & Fitzhugh, for plaintiff.

Percy & Percy and Burch, Minor & McKay, for defendant.

Mr. Justice Bachman delivered the opinion of the court.

The Darnell-Love Lumber Company is a Tennessee corporation, created in 1902, with a capital stock of $25,000, which was subsequently increased by amendment to its character in 1907 to $250,000, with shares of the par value of $100 each. It is engaged in the lumber business in Mississippi, operating mills at Leland, and holding large timber interests in the State named. The complainant, R. J. Wiggs, was one of the original incorporators of the company, holding the position of secretary and treasurer until 1917, when the interest of the Darnell estate was purchased by Mr. Wiggs and Mr. F. T. Turner, then general manager of the company, and a reorganization was effected, whereby the former became president and the latter vice president and general manager of the company, Wiggs owning 800 shares of stock

and Turner 995. In June, 1919, Wiggs was unexpectedly informed by his physician that he was afflicted with tuberlocusis, and in order to regain his health a prolonged stay in the West was imperative. Upon receiving this information negotiations ensued between Wiggs and Turner, the former seeking to obtain a leave of absence and the retention of his interests in the company, while Turner insisted that Wiggs should sell his stock and retire. After some discussion of the matter Wiggs executed to Turner a bill of sale for his 800 shares of stock, receiving therefor the sum of $150,000, $15,000 of which was paid by check of the defendant company, an indebtedness of $8,500 due by Wiggs to the Darnell estate was assumed by Turner, and for the balance of $126,500 Turner executed his notes, endorsed by the company, the same covering a period of twelve years from July 1, 1919. Subsequent to the execution of the bill of sale some question was made by Wiggs, acting upon the advise of counsel, as to the validity of the corporation's indorsement of the notes given for the deferred payments, whereupon a meeting of the stockholders was held, wherein a resolution was adopted which recited that the purchase of stock was consummated by Turner as agent for the corporation and for its benefit, it being deemed advisable that the same should be acquired by the company rather than by an outsider. After the sale Wiggs went to Denver, Colo., where he was confined in a sanitarium for some three months, during which time, on July 17, 1919, he wrote Turner, seeking the disaffirmance of the contract of sale and the return of his stock. This request was refused, and on November 26,

1919, Wiggs, by bill filed in the chancery court of Shelby county, sought to rescind the contract of sale upon the ground that the same was entered into under duress and upon the further ground that the corporation was without power, under its charter and the laws of the State to enter into such a contract, and the same was wholly void and in violation of the public policy of the State. Tender of the consideration was duly made. The chancellor found there was no duress, but that the contract was illegal and against public policy, and decree complainant a restoration of the 800 shares of stock, with all rights incident thereto. The court of civil appeals, after a thorough review, affirmed the decree of the chancellor, modifying the same, however, so as to direct the return of only 580 shares of stock, it appearing that prior to the institution of this suit, 220 of the 800 shares of stock had been disposed of by the company to purchasers not made parties to this litigation. The case is before us upon petitions for *certiorari* by both parties, the complainant asserting error in the finding that there was no duress and the denial of recovery of the 220 shares of stock transferred by the company.

The defendant assigns numerous errors to the action of the court of civil appeals authorizing a disaffirmance by complainant to any extent; those which we deem material and conclusive, and to which we direct our attention, being the void and illegal nature of the transaction and the right of complainant to obtain relief from the contract. The assignments on behalf of complainant will be overruled. The findings of the chancellor and the court of civil appeals upon the question of duress are

not conclusive upon this court under the rule announced
in *Black* v. *State*, 130 Tenn., 533, 172 S. W., 281, as the
inquiry presented is one of law and fact. While the con-
duct of Turner in the negotation for and sale of the stock
in question exhibits a harsh insistence, scarcely to be
expected between friends and intimate business associ-
ates, particularly so in this instance, in view of the
long-existing spirit of mutual helpfulness between the
parties and the peculiarly unfortunate condition of
Wiggs at the time, yet our investigation of the testimony
does not warrant the conclusion that Wiggs was so coerc-
ed or unduly influenced as to destroy his free agency
in completing the transaction, or that upon subsequent
deliberation, with the benefit of the advise of able
counsel, he did not fully ratify the same. This must
clearly appear in order that complainant be entitled to
relief against his contract. That the complainant, if
entitled to rescind, cannot recover the 220 shares of stock
disposed of by the company prior to the bringing of his
suit is clear; the holders of this stock are not before the
court, and any direction seeking the cancellation of this
stock or its return to the company would be futile; like-
wise the court has no power to order or permit the cor-
poration, of which it has jurisdiction, to issue shares
of stock in excess of the amount authorized by its char-
ter. It may be that the purchasers of this stock are
chargeable with notice of its origin and the manner in
which it was acquired by the corporation, but that is
not a material inquiry in this proceeding, wherein they
are not parties. If they were, the complainant could
hardly be heard to complain as to them. It is insisted

by the defendant that the sale of the shares of stock by Wiggs was not made to the corporation, but to Turner, and was an individual one between them. This contention is not borne out by the evidence, and it was accordingly found by both the chancellor and the court of civil appeals that the transaction was a corporate one from its incipiency. Viewing it as such, it is the position of the defendant that, circumstanced as it was at the time of the sale, in sound financial condition, the stockholders assenting and no protest of creditors, the purchase of its own shares of stock was not illegal nor violative of the public policy of the State as announced by our decisions. To this contention we cannot assent. Whatever may be the rule adopted in other jurisdictions with reference to this power of corporate bodies, or the effects resulting from its exercise, it is well settled with us that, unless expressly authorized corporations have no power to purchase shares of its own stock, and that contracts with such effect are in contravention of the public policy of the State. *Cartwright* v. *Dickinson*, 88 Tenn., 476, 12 S. W., 1030, 7 L. R. A., 706, 17 Am. St. Rep., 190; *Herring* v. *Ruskin Co-op. Association* (Ch. App.), 52 S. W., 327; *Civil Service Investment Association* v. *Thomas*, 138 Tenn., 77, 195 S. W., 775; *Whaley* v. *King*, 141 Tenn., 1, 206 S. W., 31. In their most able discussion of the above cases learned counsel for the defendant, seeking to point out the distinguishing facts upon which the disputed power may or may not be exercised, cite expressions appearing in the foregoing opinions as lending support to the proposition that the financial *status* of the corporation, or the attitude of its stockholders, are de-

terminative factors, which vest in the corporation a discretion as to the exercise of this power when not absolutely prohibited. The controlling principle upon which the decisions referred to are based, as disclosed by the reasoning employed and authorities cited, is the inherent absence of the power, as distinguished from its exercise without injurious consequences, which latter principle has found favor in a number of our American Jurisdictions, but does not exist in Tennessee, where the English rule is accepted and applied. Thus in *Cartwright* v. *Dickinson, supra,* Judge LURTON, in support of the statement that a corporation cannot reduce its authorized capital by purchasing its own shares for cancellation, refers to Morawetz on Private Corporations, section 112, where it is said:

"It is no answer to say that shares having a market value must be regarded like any other personal property, and that no person is injured if a solvent corporation in good faith purchases shares in itself at their market value, inasmuch as the shares so purchased are property in the hands of the company, and may at any time be reissued or sold. No verbiage can disguise the fact that a purchase by a corporation of shares in itself really amounts to a reduction of the company's assets, and that the shares purchased do in fact remain extinguished, at least until the reissue has taken place. The fact that such a transaction may not necessarily be injurious to any person is not a sufficient reason for supporting it. It is contrary to the fundamental agreement of the shareholders, and is condemned by the plainest dictates of sound policy."

In *Herring* v. *Ruskin Co-op. Association,* the above reasoning is cited in support of the general principle there applied in the case, where there were no creditors, and where it is to be inferred that the purpose of the acquisition of its stock, whether for cancellation or reissue, was not regarded material.

In *Civil Service Investment Association* v. *Thomas, supra,* there existed a state of facts strikingly analogous to the circumstances of the instant case, upon which the defendant predicates the legality of its purchase, yet this court therein reaffirmed its adherence to the English rule that "a corporation, in the absence of statutory authority, cannot purchase its own shares," and further said:

"We are of opinion that is it not competent for the members of a corporation to override the policy of the law, thus manifested in legislative acts, and work a change in the charter or constitution which it received from a power above it, the state, by a mere by-law such as the one advanced here as justification for the purchase of the shares of Thomas."

Supporting the conclusions there reached, reference is made to *Trevor* v. *Whitworth,* L. R., 12 App. Cas., 409, 57 L. J. Ch. N. S., 28, where it is said by Lord HERSCHELL:

"What was the reason which induced the company in the present case to purchase its shares? If it was that they might sell them again, this would be a trafficking in the shares, and clearly unauthorized. If it was to retain them, this would be to my mind an indirect method of reducing the capital of the company."

And, as pertinent to the purpose of the instant purchase as disclosed by the ratifying resolution adopted by the corporation, the speaker further observed:

"I can quite understand that the directors of a company may sometimes desire that the shareholders should not be numerous, and that they should be persons likely to leave them with a free hand to carry on their operations. But I think it would be most dangerous to countenance, the view that, for reasons such as these, they could legitimately expend the moneys of the company to any extent they please in the purchase of its shares. No doubt if certain shareholders are disposed to hamper the proceedings of the company, and are willing to sell their shares, they may be bought out; but this must be done by persons, existing shareholders or others, who can be induced to purchase the shares, and not out of the funds of the company."

The wholesomeness of our public policy which prohibits a corporation from purchasing shares of its own stock springs, not only from the necessity of restricting such bodies to the actual powers conferred upon them by charter, and those fairly to be implied therefrom (*Miller* v. *Ins. Co.*, 92 Tenn., 167-176, 21 S. W., 39, 20 L. R. A., 765); but also from the further vital consideration that the capital stock of a corporation is a trust fund for the security of existing and future creditors which shall not, save in the manner provided by law, be diminished or impaired by any act *ultra vires* the corporation. *Whaley* v. *King, supra.* It is of the highest importance that those dealing with a corporation be secure in the assurance that the amount fixed by charter is in fact available for the legitimate conduct of its business. In Machen on Corporations, section 626, the evil tendency of the exercise of such power is forcibly pointed out:

"A more subtle method of evading the rule against unauthorized reductions of capital lies in the purchase by a corporation of some of its own shares. Most unquestionably, any such purchase reduces by the amount of the purchase price the fund available for the payment of the company's actual or working capital. It also reduces the nominal capital outstanding. While the purchased shares may doubtless be reissued if the purchase is valid, nevertheless such reissue may never be feasible; for the company may never be able to find a subscriber for the shares. Hence the purchase by a corporation of its own shares amounts to a reduction of both the actual and the nominal capital of the company, and as such it should be held both *ultra vires* and illegal unless clearly sanctioned by statute. It is no answer to say that if the company is thoroughly solvent, so that its assets after the purchase are still amply sufficient for payment of all claims against it, the creditors are not prejudiced. For, while the assets may still remain sufficient, yet, they are, after the consummation of the purchase, undeniably less by the amount of the purchase money than they were before; and hence the fund which the creditors had an absolute right to have preserved intact for the payment of their claims has been diminished without their consent. This is obviously true where the shares are purchased with capital moneys of the company; and the real fact is but thinly disguised where they are bought with accumulated profits. For the company, after buying the shares, might treat them as extinguished and distribute any excess of its assets over its outstanding nominal capital among its shareholders in the shape of dividends."

And so here, whatever may have been the intention of the officers of the corporation in the purchase of the stock, whether for the purpose of resale as urged in the testimony, in which event the company cannot in any wise be considered the ignorant medium through which the shares were to be conveyed (*Green* v. *Ashe,* 130 Tenn., 615, 172 S. W., 293), or that its acquisition was deemed to the interest of the company, as recited in the minutes, the fact remains that the corporation now holds a void and illegal demand for 580 shares of its own stock.

But it is said for the defendant that, even if the contract here be held illegal and void, yet the complainant will not be permitted to rescind, for the reason that in its execution he is equally guilty with the defendant, and that he is to be repelled by the rule, *"In pari delicto potior est conditio defendentis."* Assuming the parties in equal wrong, though their respective circumstances and actions at the time of making the contract might well constitute a basis for argument that such is not true, the rule referred to is undoubtedly of general application where relief is sought upon illegal contracts which involve no consideration of the public welfare, but a well-grounded exception to this rule is found in those cases wherein the public good is to be promoted by permitting a disaffirmance of the contract although in so doing a party to its illegality may be benefited thereby. As stated in 6 R. C. L., section 220, p. 829:

"The general rule operates only in cases where the refusal of the courts to aid either party frustrates the object of the transaction, and takes away the temptation to engage in contracts *contra bonos mores,* or violating the policy of the law. If it is necessary, in order to dis-

countenance such transactions, to enforce such a contract at law, or to relieve against it in equity, it will be done, through both the parties are *in pari delicto*. The party is not allowed to allege his own, turpitude, in such cases, when defendant at law, nor is he prevented from alleging it when plaintiff in equity, if the refusal to execute the contract at law, or refusal to relieve against it in equity, would give effect to the original purpose, and encourage the parties engaging in such transactions. In such cases the guilt of the respective parties is not considered by the court, which looks only to the higher right of the public; the guilty party to whom relief is granted being only the instrument by which the public is served."

This exception is recognized in the case of *Hale* v. *Sharp*, 4 Cold., 275-281, where it is said:

"There is a well-defined distinction as to the nature and extent of the relief which will be granted to persons who are parties to agreements and other transactions against public policy, and therefore to be deemed *particeps criminis*, and that which will be granted to parties to agreements, illegal merely because they are *mala phohibita* or *mala in se*. In cases where agreements or other transactions are repudiated, on account of their being against public policy, the circumstance that the relief is asked by a party who is *particeps criminis* is not in equity material. The reason is that the public interest requires that relief should be given, and it is given to the public through the party; and in these cases relief will be granted, not only by setting aside the agreement or other transaction, but also, in many cases, by ordering a repayment of any money paid under it. 1 Story's Eq., sec. 298, and notes 1 and 2."

See, also, *Rucker* v. *Wynne,* 2 Head, 618-623; *Porter* v. *Jones,* 6 Cold., 314-327; *Johnson* v. *Cooper,* 2 Yerg., 529-530, 24 Am. Dec., 502; 13 Corpus Juris, section 441, p. 497.

Upon the facts of the present case under our decisions the corporation would be entitled to disaffirm the contract, and upon return of the stock recover the consideration paid. It may not necessarily follow therefrom that the right of rescission is reciprocal in the stockholder, yet we are convinced that where the latter seeks to restore the improperly diverted funds to the corporation and have returned to him the identical stock unlawfully acquired, in other words to re-establish the former legal *status* of the corporation with reference to its capital stock, and this it is possible to accomplish, the announced policy of the State is to be best subserved by affirmative action, rather than to permit by inaction the continued violation thereof.

We are referred to numerous cases applying the principle of *in pari delicto* upon which the defendant here relies. Particularly stressed and illustrative are the cases of *St. Louis, Vandalia & Terre Haute R. Co.* v. *Terre Haute & I. R. Co.,* 145 U. S., 394, 12 Sup. Ct., 953, 36 L. Ed., 748, and *Harriman* v. *Northern Securities Co.,* 197 U. S., 244, 25 Sup. Ct., 493, 49 L. Ed., 739. In neither of these cases is it to be found that there existed considerations of public policy deemed sufficient to take the cases out of the general rule, and the same was therefore applied, Mr. Chief Justice FULLER, in the Harriman Case, saying:

"In the present case complainants seek the return of property delivered to the Securities Company pursuant

to an executed contract of sale on the ground of the illegality of that contract, but the record discloses no special considerations of equity, justice, or public policy, which would justify the courts in relaxing the rigor of the rule which here bars a recovery. . . . .

"And it is clear enough that the delivery to complainants of a majority of the total Northern Pacific stock and a ratable distribution of the remaining assets to the other Securities stockholders would not only be in itself inequitable, but would directly contravene the object of the Sherman Law and the purposes of the government suit."

From the view which we take of this case it is apparent that the defenses of ratification and estoppel cannot avail the defendant; they cannot be relied on to supply the want of power in the corporation, for in contracts of this character the conduct of the parties cannot be held to have the effect of legalizing that which the policy of the law declares illegal.

While the defense of laches may be applicable in certain cases of this kind wherein intervening rights of innocent parties have become fixed, the instant case fails to present a state of facts upon which this defendant may claim the benefit of such defense.

A majority of the court are of opinion that there is no error in the judgment of the court of civil appeals, and the same is affirmed.

Concurring in the conclusions reached with reference to the corporate power here involved, Mr. Justice GREEN and Mr. Special Justice E. J. SMITH dissent from so much of the opinion authorizing a recovery by the complainant.