ALBERT A. WHITE, Trustee, etc., v. R. W. BRATTON et al.

Middle Section.  April 2, 1927.

Petition for Certiorari denied by Supreme Court, May 7, 1927.

1. **Appeal and error. Chancellor's findings of fact when sitting as a jury have the same effect as the verdict of a jury.**

On appeal the Chancellor's findings of fact when sitting as a jury will have the same weight and effect as the verdict of a jury rendered upon a proper charge and will not be disturbed if they are supported by any material evidence.

**2. Corporations.    Stockholders are not liable for stock improperly issued to them.**

In an action to recover from certain stockholders of a bankrupt corporation, the amount of stock subscribed for by them where the evidence showed that upon the organization of the corporation and while it was solvent the parties subscribed for certain stock and the secretary issued to them certificates in double the amount subscribed for, marking the certificate fifty per cent paid up; that upon the first meeting of the stockholders, this error was corrected, the old certificates turned in and new ones issued, for the proper amount; **held** that the stockholders were not liable for the stock which was erroneously issued to them.

Appeal from Part II, Chancery Court, of Davidson County; Hon. James B. Newman, Chancellor.

Affirmed.

Keeble, Seay, Stockell & Keeble, of Nashville, for appellant.

Harry A. Luck, R. B. C. Howell, and T. T. McCarley, of Nashville, for appellees.

FAW, P. J.    This suit was brought in Part II of the chancery court of Davidson county, on October 16, 1923, by Albert A. White, Trustee in Bankruptcy of the Hermitage Casket Company, against R. W. Bratton, James B. Cole, E. C. Norvell, A. S. Montgomery and H. E. Graper.

H. E. Graper died after answer filed and before trial in the chancery court and the suit was duly revived against John S. Fielder, executor of the will of said H. E. Graper, deceased.

When the bill was filed there was an unpaid balance of $14,717.74 on the outstanding indebtedness of the bankrupt, Hermitage Casket Company, and no assets in the hands of the trustee with which to pay same, and this suit was brought by the trustee upon the authority and direction of the bankruptcy court.

Shorn of details set forth therein, the theory of complainant's bill is that the defendants were the original stockholders and directors of the Hermitage Casket Company (a Tennessee corporation organized for the manufacture and sale of caskets) and caused certificates for shares of the capital stock of said corporation to be issued to themselves at various times, and obligated themselves by such action, and by the retention of such shares, and by treating the same as their individual property, to pay the corporation therefor in full at the par value of such shares; that the defendants have not paid in full to the corporation for the stock therein which was issued to them by said corporation, and for which they subscribed and obligated themselves to pay said corporation, and they were indebted to the Hermitage Casket Company to an amount considerably in excess of

its unpaid indebtedness at the time it was adjudged bankrupt, and they have failed and refused to pay said indebtedness to said trustee in bankruptcy, and defendants are justly indebted to complainant and the said bankrupt estate by reason thereof.

The complainant prayed for a judgment against the defendants for the total sum of their unpaid stock subscriptions, or, in the alternative, if the court should deem it more equitable, that complainant be awarded a judgment against the defendants for the sum of $14,717.74, the amount required to pay the creditors of the bankrupt estate of the Hermitage Casket Company in full, together with interest at six per cent from the filing of complainant's bill, and for the costs of the cause. Complainant also prayed for general relief.

The defendants answered the bill and denied that they subscribed for or are obligated to take and pay for any more stock in the Hermitage Casket Company than they actually did pay for; they denied that they were indebted to said corporation in any manner for any stock at the time it was adjudged bankrupt; they denied that they had failed and refused to pay any indebtedness to the said trustee in bankruptcy by reason of 'any supposed subscription to the capital stock of said company, and they denied that they are indebted in any manner to the complainant by reason of any such alleged liability.

The answer of the defendants responds specifically to each averment of the bill, but it is unnecessary to extend this opinion by a further statement of the pleadings.

After the defendants had filed their answer, they demanded a jury to try the issues of fact, and issues to be submitted to a jury were thereafter made up by the parties, under the direction of the court; but subsequently, by consent of all the parties, an order was entered waiving the presence of a jury and agreeing that the cause should be tried by the chancellor sitting as a jury; and it was so tried upon two depositions and the oral testimony of a number of witnesses heard in open court, together with numerous exhibits to the testimony.

The Chancellor reduced his findings and opinion to writing and filed same as a part of the record, and thereupon dismissed the complainant's bill and taxed the complainant and his surety with the costs of the cause, for which execution was awarded.

In due season, the complainant moved for a new trial on grounds set out in his motion (which grounds constitute the basis of the assignments of error in this court), but the motion was overruled. The complainant excepted to the action of the court in overruling his motion and prayed an appeal to this court, which was granted by the Chancellor and perfected by the complainant, and the cause has been heard by this court upon the record, the assignments of error and

brief on behalf of complainant, the reply brief for the defendants, and oral argument of able counsel for all the parties at the bar.

It must be remembered that the Chancellor's findings of fact in this case have the same weight and effect as the verdict of a jury rendered upon a proper charge, and will not be disturbed if they are supported by any material evidence; and under this rule the defendants, as the successful parties below, are entitled to all reasonable inferences which may be drawn from the evidence in their favor.

Through some of his assignments of error the complainant asserts that there is no evidence to support certain of the Chancellor's findings of fact, and through other assignments complainant challenges the Chancellor's conclusions of law upon the facts found. In logical (as in chronological) sequence, the assignments of error ordinarily follow the findings and opinion of the Chancellor, but for the purposes of our opinion in this case we will reverse the usual order of statement. The assignments of error clearly present the complainant's theory of the facts and law of the case, and, after a careful consideration of the record and the propositions of law and fact advanced on behalf of the complainant-appellant, we are of the opinion that there is ample evidence to support the Chancellor's findings of fact, and that his conclusions of law upon the facts found are sound and free from error.

Moreover, we think the Chancellor's "findings and opinion" filed in the record contains a sufficient and satisfactory answer to each and all of the assignments of error, and we see no good reason for us to undertake to state in different phraseology what the learned Chancellor has so well stated.

The appellant's assignments of error are as follows:

1. "There is no evidence to support the findings and opinion of the court and judgment thereon, because: (a) It appeared from the uncontradicted evidence that the defendants, by accepting certificates of stock in the Hermitage Casket Company, retaining the same and borrowing money thereon, became legally bound to pay for same in full. (b) The proof conclusively showed, without contradiction, that the defendants had paid for only one-half of the stock issued to them, and no facts were shown to relieve the said defendants from their responsibility as stockholders, or the duty incumbent upon them to pay for said stock in full."

2. "The court erred in not rendering judgment in favor of the complainant against the five defendants jointly in the sum of ten thousand and No/100 ($10,000) dollars, with interest from the filing of the bill because: (a) It affirmatively appeared, without contradiction, that on or about July 12, 1919, the five defendants, constituting

the incorporators of the Hermitage Casket Company, caused to be issued to themselves a joint certificate of stock in the Hermitage Casket Company for 200 shares of the par value of twenty thousand and No/100 ($20,000) dollars. (b) Two of these defendants, namely, E. C. Norvell and A. S. Montgomery, actually signed and issued this certificate as president and secretary, respectively. That all five of these defendants, to-wit, E. C. Norvell, A. S. Montgomery, H. E. Graper, J. B. Cole and R. W. Bratton, endorsed and negotiated this certificate to the Fourth & First National Bank on or about the same day it was issued, to secure a loan of $10,000, for which said five incorporators executed their personal note, and said $10,000 was paid into the treasury of the company. (c) That said certificate, when issued to and accepted by the defendants, bore in red ink, across the face thereof, the words, 'fifty per cent. paid,' and that only fifty per cent. was paid thereon by defendants, to-wit, $10,000 borrowed from the bank. (d) That this note was renewed repeatedly at the bank by these five defendants, and the stock pledged to the bank by all five of the defendants. (e) That the defendants continued to repledge this stock at short intervals to the bank on their said loan until October 1, 1921, when they paid off their note at the bank and surrendered the stock to the corporation for cancellation and had issued to them in lieu thereof 100 shares, divided into five certificates for twenty shares each, one issued in the name of each one of the defendants. (f) That on October 1, 1921, the company was insolvent. (g) That the defendants, by accepting this certificate for 200 shares, borrowing money on the same, and pledging and repledging the same to the bank, became bound to pay for same, and have paid only one-half of the price thereof, and are liable to the complainant for the balance of $10,000, with interest from the filing of the bill.''

3. ''The court erred in finding, as follows:

'' 'None of the stockholders retained this stock, but surrendered it at the first meeting of the stockholders, in obedience to the resolution adopted.'

''This is error because Certificate No. 5 issued in the joint name of all five defendants for 200 shares, was not surrendered for cancellation or cancelled until October 1, 1921, at a time when the company was insolvent.''

4. ''The court erred in holding that the five defendants did not become stockholders in the defendant company for the number of shares issued to them, because their acts of ownership over said stock were such as to conclusively show acceptance of the certificates for the amount for which they were issued.''

5. "The court erred in holding valid the resolution of certain stockholders passed March 2, 1920, recalling and cancelling the certificates of stock in question and directing the issuance of certificates in one-half said amount, because: (a) All of the stockholders were not present at said meeting and consenting thereto. (b) The rights of creditors were involved and the indebtedness of the stockholders to the corporation was a trust fund for the benefit of creditors and could not be lost to the creditors by any act of the corporation. (c) The joint certificate for 200 shares issued in the joint names of all five defendants and marked 'fifty per cent. paid' had been negotiated by these defendants to the Fourth & First National Bank for a personal loan and could not be recalled without the consent of the bank. (d) Said joint certificate, not only was not recalled and surrendered for cancellation at that time, but all five defendants, with full knowledge of all the facts, continued to repledge it to the bank on renewal loans until October 1, 1921, at which time, when the corporation was insolvent, they attempted to have it cancelled, and stock issued to them for one-half the amount."

(The assignments contain citations to the record which we have omitted in the above quotations).

In support of the assignments of error the appellant has filed a brief which has been attentively considered, but, as before indicated, we concur in the Chancellor's findings of fact and conclusions of law, and we adopt his opinion as the opinion of this court, and overrule the foregoing assignments of error.

The Chancellor's "findings and opinion" is as follows:

"This is a suit to recover for unpaid stock subscriptions. The defense set up is that the subscriptions sought to be enforced were never made by the defendants.

"A jury was demanded by the defendants, but later waived and the case set for hearing before the court sitting as a jury.

"The Hermitage Casket Company was a Tennessee corporation, with an authorized capital stock of $50,000, divided into 500 shares of the par value of $100 each, and the defendants were the stockholders and directors of this corporation.

"In December, 1921, the company was duly adjudged a bankrupt, and the complainant was elected and qualified as trustee thereof.

"Soon after the charter of this company was obtained the defendants agreed to take and paid for the following stock:

| "A. S. Montgomery, | 25 shares, | $2500.00 |
| "H. E. Graper, | 25 shares, | $2500.00 |
| "E. C. Norvell, | 25 shares, | $2500.00 |
| "R. W. Bratton, | 25 shares, | $2500.00 |
| "Jas. B. Cole, | 20 shares, | $2000.00 |

"The first four paid cash for their stock, and Cole's stock was paid for in property and from deductions made from his salary.

"At the time they paid for this stock, the company did not have a stock certificate book. These payments were made more than a month before any stock was issued to them.

"Mr. Montgomery, secretary-treasurer of the company resided at Lexington, Tennessee; Mr. Norvell, the president resided at Tracy City, Tennessee. When these stock certificates were issued by Mr. Montgomery, they having been signed in blank by the president, Mr. Norvell, at the suggestion of Mr. Graper they were issued in double the amount subscribed and paid for and marked fifty per cent paid. However, it is not claimed that there were any actual or formal subscriptions made by the defendants for the number of shares issued.

"The certificates of Messrs. Norvell and Bratton were sent to them through the mail, and soon after their receipt both notified the secretary that they were for a greater number of shares than they had paid for and agreed to take. At the first meeting of the stockholders after these certificates were issued held on March 2, 1920, a resolution was adopted that all certificates which had been issued for double the amount of stock subscribed and paid for should be returned to the corporation and cancelled, and in lieu thereof certificates for the proper amounts issued to the stockholders. At the same meeting and when the company was supposed to be prosperous and solvent a resolution was adopted providing for the sale of $2500 of the treasury stock.

"All of the stock issued in double the amount subscribed and paid for was returned to the company and cancelled, and certificates for the amount of stock agreed to be taken and actually paid for, issued. No certificate issued in double the amount the stockholder had agreed to take marked fifty per cent paid was cancelled when the company became insolvent nor when it went into bankruptcy.

"There was no action by the board of directors, or of the stockholders, that authorized the secretary-treasurer to issue this stock in double the amount subscribed for, nor was his action ever approved by the directors and stockholders of the company, but expressly disapproved by the stockholders in the first meeting held thereafter in adopting a resolution calling for the surrender and cancellation of this stock. None of the stockholders retained this stock but surrendered it at the first meeting of the stockholders in obedience to the resolution adopted.

"Sometime in May, 1919, H. E. Graper subscribed for twenty-five shares of stock for which he paid cash, and on June 30, 1919, Certificate No. 1 for fifty shares was issued to him marked fifty per cent.

paid. This stock was turned in to the company at the stockholders' meeting March 2, 1920, and cancelled, and Certificate No. 12 dated March 13, 1920, for thirty shares was issued, representing one-half of the former certificate plus five shares later purchased and paid for by Graper.

"The twenty-five shares which Bratton had agreed to take and paid for in May, 1919, were issued to him November 24, 1919, embraced in Certificate No. 10 calling for fifty shares marked fifty per cent paid. This certificate was returned to the company and cancelled March 2, 1920, and on the 13th of that month, Certificate No. 28 for the twenty-five shares he had paid for was issued in lieu thereof. Mr. Bratton, on July 16, 1920, purchased ten additional shares, represented by Certificate No. 31, for which he paid cash.

"The twenty-five shares A. S. Montgomery agreed to take and paid for in May, 1919, were issued on June 30, 1919, evidenced by Certificate No. 4 for fifty shares marked fifty per cent paid. This certificate was returned to the company March 2, 1920, and cancelled, and on the 13th of that month, Certificate No. 11 for thirty shares was issued representing one-half of the former certificate plus five shares purchased and paid for by Mr. Montgomery. Mr. Montgomery's action in issuing to himself a certificate for fifty shares when he had only paid for twenty-five shares was repudiated by the stockholders and the certificate cancelled and the same action was taken by the stockholders as to Mr. Graper's certificate. Mr. Graper was the gentleman who suggested to Mr. Montgomery that he mark these certificates fifty per cent paid. The twenty-five shares Mr. Norvell agreed to take and paid for in May, 1919, were issued on July 15, 1919, evidenced by Certificate No. 7 for fifty shares marked fifty per cent paid. This certificate was returned to the company March 2, 1920, and cancelled, and a certificate for twenty-five shares was issued to him. Later he bought and paid for five additional shares evidenced by Certificate No. 32 dated July 16, 1920, and ten additional shares evidenced by Certificate No. 34 dated August 2, 1920.

"Mr. Cole's Certificate No. 27 was issued November 30, 1920, for twenty shares, and was paid for in machinery and labor. This certificate was issued to him after the meeting of the stockholders March 2, 1920.

"In addition to these shares of stock, the secretary issued on July 12, 1919, a joint certificate to A. S. Montgomery, R. W. Bratton, H. E. Graper, E. C. Norvell, and J. B. Cole, for 200 shares of the stock of the company of the par value of $20,000 marked fifty per cent paid. This certificate was endorsed in blank by these gentlemen and deposited with the Fourth and First National Bank to secure

a loan of $10,000. This loan was negotiated by Mr. Montgomery, and a note evidencing it signed by all of these defendants. The vice-president of the bank testified that he made the loan on the personal responsibility of the five defendants, rather than on the value he attached to the collateral. Before this stock certificate was issued the defendants had agreed to each take and pay for twenty shares of the stock of the company in addition to the stock they had previously paid for. The money to buy this stock was to be raised by making their joint note and attaching the stock as collateral thereto, discounting the note in bank and turning the proceeds over to the company. None of the parties, excepting Mr. Montgomery, who signed the note and endorsed it in blank knew the certificate had been issued for that number of shares, marked fifty per cent. paid, at the time of the transaction with the bank. This stock was recalled by the resolution of the stockholders passed March 2, 1920, and its cancellation directed. When the note signed by these gentlemen was paid to the bank in October, 1921, the certificate attached as collateral was returned to the company and cancelled, and in lieu thereof twenty shares were issued to each Montgomery, Graper, Bratton, Norvell and Cole. These 100 shares had been paid for in cash in July, 1919, with the money borrowed from the bank. As stated the certificate for 200 shares of stock marked fifty per cent paid was cancelled on the books of the company in accordance with the resolution adopted by the stockholders.

"At the stockholders meeting held March 2, 1920, practically all, if not all, of the outstanding stock, issued and paid for was represented. There was no dissenting voice to the passage of the resolution recalling and cancelling stock issued in double the amount paid for and marked fifty per cent paid.

"None of the stock issued marked fifty per cent paid was voted by any shareholder at the stockholders' meeting, except the shares actually paid for, and none of these stockholders insisted on retaining or did retain the certificates after the passage of the resolution recalling this stock. As evidencing the faith of the defendants in the solvency of the company all of them except Mr. Cole, after the passage of the resolution, either endorsed notes for the company or advanced money to it or purchased additional shares of stock. The only reason the certificate for 200 shares of stock marked fifty per cent paid was not returned immediately after March 2, 1920, was because it was in the hands of the bank as collateral.

"It is insisted by the complainant:

"(a) That it was not necessary for the defendants to formally subscribe for the stock to render them responsible as stockholders, and having received and held the stock marked fifty per cent. paid,

rendered them amenable to all the responsibilities attaching in favor of creditors;

"(b) That the resolution passed by the stockholders recalling and cancelling this stock is void;

"(c) That the amount of any unpaid stock due from the subscribers is a trust fund.

"The defendants insist that they were never subscribers to any of the stock issued in excess of that they had agreed to take and had actually paid for; and that it was proper and entirely within the power of the stockholders to recall the certificates of stock wrongfully issued by the secretary.

"The first question to be determined is whether there was any valid subscription to the stock that was cancelled; a subscription to stock may be formal or implied. A valid contract of subscription to stock presupposes an agreement—a meeting of the minds of the parties to sell and purchase. Both the seller and the purchaser must assent to the same thing; have a common intention without difference.

"It is not insisted that there was any express contract of subscription for the stock involved, but that the contract is implied from the acts of the defendants. But the action of the defendants, the alleged purchasers, and of the corporation negative the idea of an implied agreement to subscribe because all of the defendants, except Montgomery and Graper, repudiated the action of the secretary in issuing certificates in double the amount subscribed as soon as it could be done, and the corporation at the first meeting of the stockholders pointedly repudiated the action of Montgomery in issuing these certificates in double the amount paid for by the defendants.

"The case of Sullivan v. Farnsworth, 132 Tenn., 694, is not in point. In that case, there was a resolution passed by the board of directors, authorizing the issuance of the stock held by Farnsworth, and he receipted for the certificates held by him, and retained them in his possession until suit was instituted. It was expressly ruled in that case that the fact that he 'receipted for, accepted and held the certificates rendered him amenable to all the responsibilities attaching in favor of creditors, and made him liable as a stockholder without any formal subscription to stock. This decision was under the statute laws of Maine where the company was incorporated and the Maine law authorizing suit against one stockholder for an unpaid subscription, rather than against all whose subscription remained unpaid, was given force and effect in this State. In the instant case, there was no resolution by the board of directors authorizing this stock to be issued in double the amount paid for marked fifty per cent paid. It was not receipted for and held by the defendants.

until suit was instituted against them. Soon after it was received by these defendants, they notified the proper officials that they wanted the stock issued in accordance with their contract. As soon as the stockholders could remedy this wrongful act they recalled the stock issued in double the amount paid for and had it cancelled. These facts are entirely dissimilar from the facts in the Sullivan case, and to which the principles of law there announced have no application.

"It is said that the unpaid subscriptions are a trust fund and that the stockholders had no power to recall this stock because all the stockholders were not present, and that creditors were involved. Section 2058 of Shannon's Annotated Code relied upon by the complainant, provides in substance that the amount of any unpaid stock, 'due from a subscriber to a corporation' shall be a fund for the payment of debts. There was no valid subscription, formal or implied, for the stock involved, and therefore, nothing 'due' and it was clearly within the power and was the duty of a majority of the stockholders, or even the board of directors, to recall and cancel the stock wrongfully issued, and issue in lieu thereof the stock that had actually been subscribed and paid for by the defendants. Admittedly, as ruled in the case of Cartwright v. Dickinson, 88 Tenn., 476, the power to release after a subscription had become absolute lies with all the stockholders, rights of creditors being out of the way, but it has never been questioned that the directors or a majority of the stockholders may recall stock wrongfully and illegally issued in the hands of the person to whom issued, and upon his insistence. The statement of this proposition is its answer and authority.

"The company was not insolvent, nor did any of these defendants consider it insolvent, when the stock wrongfully issued was recalled and cancelled in March, 1920.

"The court is of opinion that there was no valid subscription by the defendants to the stock involved, and that they are not liable for any unpaid subscription thereon.

"Decree accordingly.

"NEWMAN, Chancellor."

It results that, for the reasons stated by the Chancellor, his decree dismissing the complainant's bill at the cost of complainant and his surety is affirmed. The costs of the appeal will be adjudged against the complainant and the surety on his appeal bond.

Crownover and DeWitt, JJ., concur.